**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

David Vipond,

       Plaintiff,                                  Case No.

    v.                                       **COMPLAINT**

David DeGroat, in his official capacity
as Judge of White Earth Tribal Court,
and Monica Hedstrom, in her official
capacity as Director of Natural
Resources, White Earth Department of
Natural Resources,

       Defendants.

---

Plaintiff David Vipond brings this action to enjoin tribal court proceedings against him and declare that the tribal court lacks jurisdiction over him in the lawsuit brought by the White Earth Department of Natural Resources (WEDNR). The tribal court suit seeks to enjoin Mr. Vipond from installing a pump for which he received a permit from the Minnesota Department of Natural Resources (MDNR). The pump would irrigate Mr. Vipond's farmland from waters from the Wild Rice River, on his privately-owned property located within the boundaries of the White Earth Reservation. WEDNR has alleged that Mr. Vipond, a non-member of the Band, is required to obtain a permit from WEDNR for such activities.

WEDNR claims its regulatory authority within its boundaries preempts the authority of the State of Minnesota over the navigable waters of the Wild Rice River. WEDNR has not joined the State of Minnesota in its tribal court action, despite its claim of preemption.

Its failure to join the State prevents a proper adjudication of the rights and interests of all affected parties. The tribal court lacks jurisdiction over this action because it cannot adjudicate the allocation of the water rights on a navigable river under the jurisdiction of the State of Minnesota. The tribal court cannot adjudicate any claimed retained federal water rights by the White Earth Band, which is a question of federal law. WEDNR cannot satisfy the second *Montana* exception for tribal jurisdiction over non-members on non-member-owned fee lands, which requires that the action cause "catastrophic" harm to a tribe, because the State of Minnesota permitted the proposed pumping by Mr. Vipond and considered the impacts of the pumping in its permitting process. Further, WEDNR cannot satisfy the second *Montana* exception because the tribal court lacks jurisdiction over the State of Minnesota, which is a necessary and indispensable party to an action involving jurisdiction over navigable waters and allocation of those waters. Tribal courts are not courts of general jurisdiction. This Court has subject matter jurisdiction to enjoin further tribal court proceedings and declare that the tribal court lacks jurisdiction over Mr. Vipond.

## PARTIES

1.      Plaintiff David Vipond is a citizen of Mahnomen County, State of Minnesota, and is neither a member of the White Earth Band of Ojibwe nor an Indian in ancestry.

2.      WEDNR sued Plaintiff in White Earth Tribal Court (the "Tribal Court Action").

3.      Defendant David DeGroat is a judge of the White Earth Tribal Court. He is sued in his official capacity only. Judge DeGroat presides over the Tribal Court Action.

2

Judge DeGroat is named as a necessary defendant for purposes of entering declaratory and injunctive relief. *Nevada v. Hicks*, 533 U.S. 353 (2001).

4.      Defendant Monica Hedstrom is the Director of Natural Resources of the WEDNR. She is sued in her official capacity only, for purposes of entering declaratory and injunctive relief. *Id.*

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 1362 to adjudicate claims brought by a party seeking a declaration that a tribal court lacks jurisdiction over the plaintiff and enjoining further tribal court proceedings. *See, e.g., Nevada v. Hicks*, 533 U.S. 353, 358 (2001); *Montana v. United States*, 450 U.S. 544, 565 (1981).

6.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(1), (2) because the defendants reside in this district, and the events leading to this suit occurred in this district.

## MDNR PERMIT APPLICATION BACKGROUND

7.      Mr. Vipond is a farmer in Mahnomen County, Minnesota. Mr. Vipond has been farming his land in Mahnomen County for 35 years. Mr. Vipond's residence and farmland are within the White Earth Reservation.

8.      He owns, in fee, a combined 611 riparian acres of farmland adjacent to the Wild Rice River in Sections 18 and 19 of Pembina Township, Mahnomen County, Minnesota. (Ex. 1, MDNR Findings of Fact, ¶ 7.)

9.      On March 27, 2023, Mr. Vipond submitted a water appropriation permit to the MDNR, application number 2023-0709, for the appropriation of up to 65.2 million gallons of surface water per year for agricultural irrigation on 353 acres. (*Id*. ¶ 1.)  The White Earth Water Protection Ordinance at issue in the Tribal Court Action did not exist when this permit application was made to MDNR.

10.      The permit application proposed the use of one surface water pump. The application also proposed that the surface water would be pumped from the Wild Rice River at a rate of up to 1,000 gallons per minute. (*Id*. ¶ 2.)

11.      The pump would irrigate Mr. Vipond's crops of corn, dry beans, soybeans, wheat, sugar beets, and alfalfa. (*Id*. ¶ 3.)

12.      This amount of water appropriation requires a permit under state law from the Minnesota DNR. *See* Minn. Stat. § 103G.271, subd. 4. (*Id*. at ¶¶ 4-5.)

13.      Mr. Vipond followed the required procedures in the application process. (See *id*. ¶¶ 8-14.)

14.      These requirements included providing: (1) a statement of justification supporting the reasonableness and practicality of use with respect to the adequacy of the water source; (2) data on proposed water conservation practices in compliance with Minn. Rule 6115.0660, subp.3F; and (3) a contingency plan describing the alternatives Mr. Vipond will use if further appropriation is restricted due to low flows or low water levels in the river, stream, or basin where the water appropriation is occurring. (*Id*. ¶¶ 11-13.)

15.      Mr. Vipond indicated he would implement a low flow irrigation system, soil moisture monitoring, and buffer strips. (*Id*. ¶ 12.)

16.     Mr. Vipond agreed to withstand the results of not being able to appropriate water. (*Id.* ¶ 13.)

17.     From April 24, 2023 through May 25, 2023, a request for comments period was held by MDNR regarding Mr. Vipond's DNR Water Appropriation Permit Application. White Earth Nation was one of the parties included in the request for comments. (*Id.* ¶ 15.)

18.     MDNR sent information to, and solicited comments from, various White Earth Nation tribal staff. Tribal coordination began on April 24, 2023. (*Id.* ¶ 16.)

19.     By August 11, 2023, no comments had been received from White Earth regarding Mr. Vipond's permit. (*Id.*)

20.     Despite not hearing from White Earth, MDNR reached out directly to coordinate with the Band. MDNR called White Earth on August 8, 2023. On August 11, MDNR sent the WEDNR Director an email informing the tribe that the DNR Water Appropriation Permit Application for Mr. Vipond would be issued. (*Id.* ¶ 17.)

21.     Although Mr. Vipond received his State permit, he has neither installed nor pumped water from the Wild Rice River as allowed by the State permit. He has not made a final decision as to whether he will install a pump.

**WHITE EARTH BAND'S WATER PROTECTION ORDINANCE**

22.     On May 5, 2023, after Mr. Vipond had applied for a State permit, but before the permit was issued, the White Earth Reservation Business Committee (White Earth RBC), adopted Resolution No. 057-23-017, which enacted the White Earth Reservation Groundwater and Surface Water Protection Ordinance ("Water Protection Ordinance" or

"Ordinance"). Under Section 11, the effective date of the Ordinance was the date of passage on May 5, 2023. A copy of the Resolution is attached as Exhibit 2.

23.    Mr. Vipond is engaged in agriculture solely within the White Earth Reservation. The Water Protection Ordinance requires a permit before installation of a high-capacity surface water pump, imposes a $5,000 application fee under Section 6.2(b), and requires a cost reimbursement agreement for the completion of permit review that could impose additional fees for Permit Application Review.

24.    On June 12, 2024, the White Earth RBC adopted Resolution No. 057-24-030, that "suspended" the permit requirement and other regulatory provisions of the Water Protection Ordinance for existing sources duly permitted by the MDNR as of May 5, 2023 and operating in compliance with a valid permit.  A copy of that Resolution is attached as Exhibit 3.

## THE TRIBAL COURT ACTION

25.    WEDNR filed suit against Mr. Vipond in its tribal court on August 23, 2023, seeking (1) a declaration that Mr. Vipond may not install or operate a pump on the Wild Rice River that pumps more than 10,000 gallons of water per day or more than one million gallons of water per year (a "High-Capacity Pump") within the geographic scope covered by the Water Protection Ordinance without a validly-issued permit from WEDNR in accordance with the Ordinance; (2) a declaration that the Water Protection Ordinance governs the extent of Mr. Vipond's right, if any, to pump water from the Wild Rice River for any purpose within the geographic scope covered by the Water Protection Ordinance; and (3) a temporary and permanent injunction enjoining Mr. Vipond from installing or

operating a High-Capacity Pump on the Wild Rice River within the geographic scope covered by the Water Protection Ordinance without a validly issued permit from WEDNR issued in accordance with the Ordinance. A copy of the current Complaint is attached as Exhibit 4.

26.    Simultaneous with the Summons and Complaint, WEDNR filed a Motion for Preliminary Injunction, Supporting Memorandum, and Proposed Order, along with affidavits in support of the Motion.

27.    On September 13, 2023, before the time to Answer had run and before a hearing date had been obtained, as required under the White Earth Rules of Civil Procedure, Judge DeGroat issued an *ex parte* order granting WEDNR's Motion for Preliminary Injunction.

28.    Specifically, the order provided that "during the pendency of the above-captioned action, Defendant David Vipond is enjoined from installing or operating a high-capacity pump (defined as any pump that can pump more than 10,000 gallons of water per day or more than one million gallons of water per year) on the Wild Rice River within the geographic scope covered by the Water Protection Ordinance absent a validly issued permit from the White Earth Department of Natural resources [sic] issued in accordance with the Water Protection Ordinance." A copy of the order is attached as Exhibit 5.

29.    On September 20, 2023, Mr. Vipond filed its Special Appearance Answer, denying that WEDNR is entitled to the relief sought, and asserting several affirmative defenses, including that WEDNR lacks jurisdiction over Defendant. A copy of the current Answer is attached as Exhibit 6.

30.    On October 10, 2023, Mr. Vipond filed his Notice of Appeal to the White Earth Court of Appeals regarding the district court's order. The Notice of Appeal asserted that the Order for Injunction was entered without scheduling a hearing as required, without an opportunity for Mr. Vipond to respond to the Motion and before any response was due and was entered without a hearing. The Notice of Appeal also asserted that the Tribal Court determined it had jurisdiction without meeting the requirements for jurisdiction over a non-member for activities on fee lands, as set forth in *Montana v. United States*, 450 U.S. 544 (1981). Lastly, Mr. Vipond asserted that no basis for an injunction existed. A copy of the Notice of Appeal is attached as Exhibit 7.

31.    On October 26, 2023, the White Earth Court of Appeals ordered that: (1) the appeal was dismissed without prejudice and the case remanded to the Tribal Court for further proceedings; (2) the Order for Injunction be treated as a temporary restraining order under Rule XI of the Rules of Civil Procedure, remaining in place pending further proceedings of the Tribal Court; (3) WEDNR's motion for preliminary injunction be set for a hearing date within 30 days; and (4) in determining whether a preliminary injunction should be issued, the Tribal Court shall enter detailed findings on jurisdiction and other criteria for issuance of an injunction. A copy of the Court of Appeals order is attached as Exhibit 8.

32.    After the matter was returned to the Tribal Court, the parties met and conferred in an attempt to agree to an efficient resolution of issues relating to the jurisdictional and preliminary injunction issues, pursuant to the White Earth Appellate Court's order. The parties were unable to come to an agreement on what each considered

to be a reasonable amount of discovery on the issues of jurisdiction and the preliminary injunction. Accordingly, the parties submitted separate status reports to the Tribal Court in advance of its Status Conference on November 14, 2023.

33.     The morning of the Status Conference, WEDNR filed its Initial Status Report with the Tribal Court, setting out its positions and its argument for why WEDNR requested a proposed schedule for discovery beginning immediately, expert reports, depositions, and a hearing *solely* to determine jurisdiction to take place in June 2024.[1]

34.     In its Status Report, WEDNR asserted its argument regarding jurisdiction and its basis for the water rights possessed by the White Earth Band in greater detail. WEDNR asserted that the State of Minnesota's actions in environmental regulation of bodies of water are preempted as they relate to waters on and appurtenant to the Reservation under the *Winters* doctrine and its progeny. A copy of WEDNR's Initial Status Report is attached as Exhibit 9.

35.     WEDNR had not before asserted its position that the State of Minnesota's authority to issue permits to citizens of the State of Minnesota on navigable bodies of water within the State is preempted by Band authority because of the Band's federal reserved water rights.

36.     Judge DeGroat granted WEDNR's proposed schedule for discovery and briefing on the issues of jurisdiction and the preliminary injunction. A copy of that order is attached as Exhibit 10.

---

[1] The hearing to determine jurisdiction is now scheduled for late October 2024.

37.     On February 13, 2024 an Order for Extension of Deadlines was filed, due to the serious health issues of Mr. Vipond's lead counsel, Randy Thompson, and the deadlines in the tribal court's scheduling order were extended by four months to allow the accommodation of required medical care and treatment.

38.     On June 14, 2024, the White Earth Band delivered extensive written expert witness reports, including numerous affidavits. The Tribal Court Action has upcoming depositions and  discovery, and Mr. Vipond's expert reports were served on July 29th, 2024.

39.     Further proceedings in the White Earth Tribal Court to determine jurisdiction would be futile, because the proposed findings to determine jurisdiction involve complex scientific issues closely integrated with hydrology, water use, water allocation, as well as the interests of the State of Minnesota and other impacted and affected landowners and parties, who are neither parties to the Tribal Court Action nor can they be joined as parties.

40.     The June 12th, 2024 Resolution suspending the Water Protection Ordinance as to existing sources indicates that WEDNR will engage in the ongoing and further scientific study and related issues, "including inter-connectedness of surface and groundwater, groundwater monitoring, the source and timing of aquifer recharge, and the effects of aquifer dewatering, aquifer contamination from human sources, and substantial adverse impacts of high-capacity pumping on aquatic species and habitat critical to sustaining the White Earth Nation and its members." (Ex. 3 at 3.) The Resolution further provides that  WEDNR is coordinating with MDNR, regional watershed commissions, and other stakeholders regarding the study, protection and management of waters in the region,

and developing a regional task force with neighboring counties so that the Band can work collaboratively and expand its efforts to comprehensively address the quantity and quality of water within, adjacent and well beyond the reservation. (*Id*. at 4.)

41.    Further, the Resolution states that the Band has determined that further analysis of the existing sources and information on the ongoing scientific studies and cooperative efforts would be beneficial to the effective implementation of the Water Protection Ordinance. Reporting to the committee on these efforts will not occur until the end of 2026. (*Id*. at 4-5.)

42.    Because the Water Protection Ordinance is suspended for existing sources to allow additional study and inter-governmental coordination, the Band's need to regulate Mr. Vipond under the Water Protection Ordinance is premature under the Band's claim that these are interconnected issues that can only be addressed by the Band's regulation of non-members.

### THE WATER PROTECTION ORDINANCE
### DOES NOT SATISFY THE SECOND *MONTANA* EXCEPTION

43.    Under *Montana v. United States*, 450 U.S. 544 (1981) and *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316 (2008), Indian tribes lack jurisdiction over the activities of non-members and their fee lands even within reservations unless one of two exceptions exist. The Water Protection Ordinance states that the Band has jurisdiction over Mr. Vipond because his "conduct threatens or has some direct effect on the political integrity or the economic security or the health or welfare of the tribe," which is the second exception set forth in *Montana*. 450 U.S. at 565-66. In *Plains*

11

*Commerce Bank*, the Supreme Court further explained that under that second exception, the conduct or activity of the non-member "must do more than injure the tribe, it must 'imperil the subsistence' of the tribal community." 554 U.S. at 341 (quoting *Montana*, 450 U.S. at 566).

44.    Citizens of the United States are subject, by the United States Constitution's structure and provisions, to be regulated only by federal and state governments as sovereigns. Tribal jurisdiction over non-members is prohibited except in very narrow circumstances that do not exist for an activity that is specifically regulated by and permitted by state law.

45.    The Water Protection Ordinance was enacted and operates under the assumption that the installation of any high-capacity pump, under any circumstances, satisfies the second *Montana* exception.

46.    WEDNR and the tribal court have sought to impose upon Mr. Vipond hundreds of thousands of dollars of legal fees, expert witness fees, and litigation costs in order to defend against an allegation of tribal jurisdiction over Mr. Vipond under circumstances in which the Band lacks both regulatory and adjudicatory jurisdiction over Mr. Vipond under binding precedent.

47.    On June 12, 2024, White Earth RBC suspended the Water Protection Ordinance's permit requirement for high-capacity pumping in existence as of May 5, 2023 and duly permitted by MDNR. (Ex. 3.)

48.    The Resolution claims that the WEDNR is engaged in ongoing and further scientific study of hydrology and its various impacts, and working with other bodies

including the MDNR, regional water commissions, neighboring counties, tribal nations, and state and federal agencies to expand its efforts to comprehensively address quantity and quality of water within the Reservation.

49.    The suspension of the Water Protection Ordinance did not apply to New Sources as defined by the Ordinance; namely, the permit would still be required unless the pumping activity had been permitted by the MDNR as of May 5, 2023 and was operating in compliance with that valid permit.

50.    The result of the June 12, 2024 Resolution suspending the Water Protection Ordinance is that WEDNR is apparently only enforcing the Ordinance against Mr. Vipond.

51.    The suspension of the Water Protection Ordinance appears designed to avoid having to defend the Ordinance in the United States District Court for the District of Minnesota in the suit brought in *R.D. Offutt Farms Co. v. White Earth Div. of Natural Resources et al.*, Case No. 24-CV-01600, filed May 3, 2024. The facts and claims in that suit are related to the facts and claims in this action.

52.    WEDNR apparently desires to litigate these issues only in tribal court and only against Mr. Vipond, and without the participation of the State of Minnesota and other affected parties.

**DATA REGARDING THE APPROPRIATION AND THE WILD RICE RIVER**

53.    Under the permit issued by MDNR, the surface water pump, if installed by Mr. Vipond, would be installed directly in the Wild Rice River, approximately 0.6 miles (or 1.13 stream miles) upstream from the western boundary of the White Earth Reservation. (Ex. 1, ¶ 18.)

54. There are no Band-owned lands nor tribal-member-owned lands adjacent to the Wild Rice River that are downstream of Mr. Vipond's pumping location.

55. Water in the Wild Rice River flows generally to the west from Mr. Vipond's property for approximately 44 miles to the confluence with the Red River of the North (H-026.) (*Id.*)

56. There is one active MNDNR-issued Water Appropriation Permit downstream of Mr. Vipond's proposed appropriation point on the Wild Rice River. This permit is located 27 miles downstream in Norman County. The permit authorizes the use of up to 19.6 million gallons of water pumped at a rate of 1,200 gpm. (*Id.* ¶ 20.)

57. Mr. Vipond's MDNR Appropriation Permit is subject to suspensions due to low flows. The sentinel gauge is located approximately 10.5 miles downstream. The low flow suspension level is 18 cfs. (*Id.* ¶ 22.)

58. Average daily flows for the growing season (May 1 through October 31) from 2015 through 2020 were evaluated for the USGS gauge at Twin Valley and the MDNR-operated gauge near Mahnomen. Average daily flows are approximately 275 and 205 cfs respectively. (*Id.* ¶ 24.)

59. Flow data at the gauge near Mahnomen between the months of June through August were available for 2021-2023. That data recorded average discharges of 208 cfs in June, 66 cfs in July, and 29 cfs in August. *See* Cooperative Stream Gaging, MDNR, https://www.dnr.state.mn.us/waters/csg/index.html.

60. Flow data has been recorded at the Twin Valley gauge since 1909. Mean monthly flow data is 365 cfs for June, 263 cfs for July, and 121 cfs for August. *Id.*

61.     Mr. Vipond's proposed appropriation would be approximately one percent of the average daily flow evaluated at the Twin Valley stream gauge (Ex. 1, ¶ 24.)

62.     Average annual flows in the Wild Rice River have increased by 163 cfs annually since 1992 at the Twin Valley USGS gauge, which is 21.8 stream miles downstream of the proposed pumping site. *See* Minnesota Department of Natural Resources. 2023. *Evaluation of Hydrologic Change (EHC) Technical Summary: Wild Rice River Watershed*, https://wrl.mnpals.net/index.php/node/4103

63.     Q90 is the term used to indicate the level above which the water flows 90% of the time on the River. Flows below the Q90 value are those calculated to occur 10% of the time.

64.     Q90 on the Wild Rice River—flow suspension—is 18 cfs. The maximum proposed pumping rate is 1,000 gallons per minute, which is 2.2 cubic feet per second. 2.2 CFS is 12% of the flow at the proposed pumping site at Q90, MDNR has established that Q90 is the threshold for maintaining environmental viability and sustainable ecological integrity. Guidelines for Suspension of Surface Water Appropriation Permits, MDNR, https://files.dnr.state.mn.us/natural_resources/climate/drought/drought_permit_suspension.pdf.

65.     Low flows are a natural occurrence. 2.2 cfs is 1% of normal summer seasonal (growing season) in the Wild Rice River at the proposed pumping site. Normal Q50 growing season flows are approximately 220 cfs. *Id*.

66.     Precipitation in the drainage area is increasing. The Wild Rice River Area near the proposed pumping site has 24.4" of annual precipitation, from data years 1989

through 2018, an increase of 1.5" annually compared to the longer historical period of record of 1895 through 2018. Climate Summary for Watersheds, Wild Rice River, MPCA, https://files.dnr.state.mn.us/natural_resources/water/watersheds/tool/watersheds/climate_ summary_major_60.pdf.

67.     There is no sturgeon migration with reproduction in the Wild Rice River currently. The White Earth Band advises that they have begun efforts to stock sturgeon so that they will migrate into the Wild Rice River for spawning. Sturgeon stocking for reproduction efforts takes approximately 25 years and may or may not be successful. According to MDNR, sturgeon migration occurs from mid-May through June. Agricultural irrigation typically occurs from June to September 15th. Species Profile, Lake Sturgeon, MDNR, https://www.dnr.state.mn.us/minnaqua/speciesprofile/lake_sturgeon.html.

68.     There is overlap between the months with the highest annual river flow volume and the proposed pumping months. The highest Wild Rice River flow volume months are April to July. Late summer and fall—August and September—would be the likeliest time to see lower river flows. Sturgeon migration is not normally occurring during these times. Wild Rice River Watershed Stressor Identification Report, Minnesota Pollution Control Agency, https://www.pca.state.mn.us/sites/default/files/wq-ws5-09020108a.pdf.

69.     The proposed pumping itself would not impact fish passage. The upstream Lower Rice Lake dam currently impedes fish passage if stop logs are placed in the dam.

70.     Due to natural, seasonal fluctuations in water levels on the Wild Rice River and the speed and volume of the River's flow, the River at the proposed pumping site and

further downstream within the White Earth Reservation is unsuitable for growing wild rice. There is a dam at Lower Rice Lake, upstream from Mr. Vipond's land, which limits the flow of water into the Wild Rice River in order to maintain a more stable water level on Lower Rice Lake for the cultivation of wild rice. Lower Rice Lake is the location for most wild rice harvesting.

71. The proposed pumping site is 84.35 stream miles downstream from the White Earth Reservation's eastern boundary. The drainage area upstream of the pumping site is 595 square miles. The pumping site is 1.13 stream miles from the White Earth Reservation's western boundary. The additional drainage area downstream of the pumping site to the western boundary is 0.49 square miles.

72. The appropriation proposal does not affect 99.992% of the drainage area and 98.7% of the stream channel length within the Reservation's boundaries.

73. There are 15 known additional active appropriation permits within the Reservation boundaries. There are no known additional appropriations directly from the Wild Rice River within the Reservation boundaries. Minnesota Water Use Data, MDNR, https://www.dnr.state.mn.us/waters/watermgmt_section/appropriations/wateruse.html.

74. The proposed appropriation of 200.2 AF and 1,000 gallons per minute is a very small amount of the Wild Rice River flow. The proposed appropriation is a small portion of increasing precipitation and runoff due to climate variability.

75. The amount of the permitted appropriation is less than the statistical variability that can be expected to occur naturally. For example, the proposed pumping

would remove a certain volume of water on a given day, but the air temperature or wind has a significantly greater influence affecting resultant stream flows due to evaporation.

76. The concerns raised by WEDNR, including minnowing, leeching and wild rice production, are entirely upstream from the proposed appropriation site. There is no way for the proposed pumping volume and rate to make a measurable difference to the water resources upstream.

77. MDNR concluded that it did not anticipate negative impacts of Mr. Vipond's proposed water appropriation on the water supply in the Wild Rice River. (Ex.1, ¶ 26.)

78. WEDNR and its counsel met with MDNR representatives in July 2024 and shared WEDNR's expert reports from the Tribal Court Action. The reports claim that the pumping would injure the river and its ecology. After reviewing WEDNR's expert reports, MDNR did not revoke or modify Mr. Vipond's permit.

79. Since 2008, surface water appropriation permits have been suspended in the Wild Rice River watershed twice, in 2008 and in 2021. (*Id*. ¶ 27.)

80. A standard requirement of surface water appropriation permits is to screen the intake to prevent the incidental take of aquatic species and avoid negative impacts as a result of the appropriation. (*Id*. ¶ 28.)

81. In summary, because the location of the proposed pump does not impact 98% of the stream length, 99.992% of the drainage area, and permits pumping of only 1% of the average daily flow of the Wild Rice River, it is difficult to envision a proposed pumping location on the White Earth Reservation that would have less impact than the one WEDNR seeks to prevent.

19

**MDNR'S APPLICATION OF MINNESOTA STATUTORY CRITERIA**

82. Under Minnesota Statutes section 103G.315, subd. 3, the DNR may issue a water appropriation permit for appropriations from surface water only if it determines that the use is reasonable, practical, and will adequately protect public safety and promote public welfare within the meaning given in the statute. (Ex. 1, ¶ 30.)

83. Based on its findings of fact and the record on file, MDNR concluded that Mr. Vipond's water appropriation permit was consistent with state water appropriation statutes and recommended that his permit be issued. (*Id*.)

84. The MDNR is charged with conserving and managing the State's natural resources. Its mission, as set forth on the Department's website, states in relevant part: "DNR manages natural lands such as forests, wetlands, and native prairies; maintains health populations of fish and wildlife; and protects rare plant and animal communities throughout the state. DNR manages the state's water resources, sustaining healthy waterways and ground water resources." Our Mission, MDNR, https://www.dnr.state.mn.us/aboutdnr/mission.html#:~:text=DNR%20manages%20natural%20lands%20such,waterways%20and%20ground%20water%20resources.

**BACKGROUND OF THE WHITE EARTH BAND OF OJIBWE**

85. The White Earth Reservation was created by the 1867 Treaty, 16 Stat. 719, after Minnesota became a state in 1858.

86. The White Earth Reservation created in 1867 replaced the reservation created by the 1864 Treaty (13 Stat. 693) because the White Earth Reservation was deemed more

20

suited to agriculture. One of the purposes in the creation of the White Earth Reservation was a suitable location for agriculture.

87. The White Earth Reservation is a so-called open reservation. Following the Nelson Act (25 Stat. 642), after lands were allocated to members of various Ojibwe Bands who moved there, the remaining lands were made available for settlement and sale to non-members. Some Ojibwe who obtained fee title to their allotted lands eventually sold those lands to non-Indians.

88. Today non-members are slightly more than fifty percent of the resident population of the White Earth Reservation. Approximately half of the land is in fee ownership, while the remainder of the White Earth Reservation is owned by federal, state, and county governments and the White Earth Band, with the majority of that land in state, federal or local government ownership.

89. The White Earth Band is a constituent member of the Minnesota Chippewa Tribe, which has a tribal constitution. The Minnesota Chippewa Tribe has a Tribal Executive Committee that is comprised of members of its constituent bands.

90. The Band has a Reservation Business Committee, which is comprised of representatives from each of its three Districts, a Chairman, and a Secretary/Treasurer. White Earth also has a tribal court and a court of appeals.

91. The Band's judiciary is not an independent branch of government. The Reservation Business Committee is responsible for hiring and firing the tribal court judges.

21

## APPLICABLE LEGAL BACKGROUND

92.     The Equal Footing Doctrine is a constitutional requirement that recognizes that when a state was admitted to the union, it enters "on an equal footing with the original States in all respects whatever." *Pollard's Lessee v. Hagan*, 44 U.S. 212, 221-22 (1845). In *Pollard's Lessee*, the Court recognized: "The shores of navigable waters, and the soils under them, were not granted by the Constitution to the United States, but were reserved to the states respectively; and the new states have the same rights, sovereignty, and jurisdiction over this subject as the original states." *Id.* at 212.

93.     Under the Equal Footing Doctrine, when sovereign title is in place before any claim of aboriginal title has ripened, the state's claim of ownership to the bed of a navigable waterway is preeminent unless a recognized exception to the doctrine is applicable. *Yankton Sioux Tribe of Indians v. State of S.D.*, 796 F.2d 241, 244 (8th Cir. 1986).

94.     The Equal Footing Doctrine creates a presumption in favor of state ownership of navigable waters.

95.     As set forth by the Court in *Montana*, "[B]ecause control over the property underlying navigable waters is so strongly identified with the sovereign power of government [...] it will not be held that the United States has conveyed such land except because of 'some international duty or public exigency.' 450 U.S. 544 at 552 (quoting *United States v. Holt State Bank*, 270 U.S. 49, 55 (1926)).

96.    The State of Minnesota was created by the Enabling Act in 1858. The Enabling Act contained no exceptions to the State of Minnesota having jurisdiction over the beds of navigable waters and the natural resources of the state, including water.

97.    Under Minnesota law, the State has exclusive jurisdiction to regulate waters within Minnesota's borders. Minn. Stat. § 1.01.

98.    The 1867 Treaty that created the White Earth Reservation contains no language preempting nor diminishing the State of Minnesota's jurisdiction over navigable waters. 16 Stat. 719.

99.    The White Earth Reservation does not preempt or diminish the State of Minnesota's jurisdiction over its navigable waters.

100.    Whether a body of water or waterway is navigable is just a determination of whether the waterway is public or private. *Lamprey v. Metcalf*, 53 N.W. 1139 (Minn. 1893). If a waterway is capable of being put to any beneficial public use, it is navigable or "public waters." *Id*.

101.    The State of Minnesota owns the bed of navigable waters below the low-water mark in trust for the people for public uses, including commercial navigation, the drawing of water for various private and public purposes, recreational activity, and similar water-connected uses. *State by Head v. Slotness*, 185 N.W.2d 530, 532 (Minn. 1972).

102.    The Wild Rice River is identified and listed by the State of Minnesota as a navigable body of water.

103.    The Wild Rice River meets the criteria for "public waters" under Minn. Stat. § 103G.005, subd. 15. *See* Final Designation of Protected Waters and Wetlands

23

Within Mahnomen County, MDNR,

https://files.dnr.state.mn.us/waters/watermgmt_section/pwi/MAHN_PWILIST.PDF,

which designates the inventory of Protected (i.e., Public) Waters for Mahnomen County,

pursuant to Minn. Stat. § 105.391, subd. 1.

104.   Mr. Vipond, as the owner of land adjacent to the Wild Rice River, has riparian rights to use water from the river for irrigation purposes, subject only to State permitting requirements.

105.   Under Public Law 280 (PL280), Congress delegated its federal law enforcement authority and jurisdiction over Indian country to states. Minnesota is a PL280 state. Minnesota has criminal jurisdiction and some civil jurisdiction over tribal members within the White Earth Reservation. The State of Minnesota has full jurisdiction over non-members and their fee lands within the White Earth Reservation.

106.   Through PL280 therefore, Congress has already given the State of Minnesota jurisdiction over most legal matters in Indian country, including the regulation and protection of the State's natural resources.

107.   The Constitution allows a State to exercise jurisdiction in Indian country. *See Oklahoma v. Castro-Huerta*, 597 U.S. 629, 636 (2022). "Indian country is part of the State, not separate from the State […] as a matter of state sovereignty, a State has jurisdiction over all of its territory, including Indian country." *Id*. (citing U.S. Const. amend. X.)

108.   The McCarran Amendment, 43 U.S.C. § 666, integrated federal water rights with state rights and transferred adjudication of water rights disputes to state courts. The Senate Judiciary Committee report explained: "Since it is clear that the States have the

24

control of the water within their boundaries, it is essential that each and every owner along a given water course, including the United States, must be amenable to the law of the State, if there is to be a proper administration of the water law as it has developed over the years." S. Rep. No. 755, 82nd Cong., 1st Sess. 6 (1951).

109.    The McCarran Amendment does not provide for adjudication of non-member and state water interests in tribal court.

110.    Tribal courts are not courts of general jurisdiction, and a tribe's inherent adjudicative jurisdiction over non-members is at most only as broad as its legislative jurisdiction. *Nevada v. Hicks*, 533 U.S. 353, 367 (2001).

111.    The aspect of the *Winters* doctrine that confers exclusive and preemptive tribal jurisdiction over a stream does not apply to (a) navigable bodies of water under State jurisdiction and (b) to a body of water that begins outside of a reservation and exits the reservation, and connects to other navigable bodies of water. *See Winters v. United States*, 207 U.S. 564 (1908) (holding that, when a reservation is created by Congress, the water that is sufficient to fulfill the purpose of the reservation is also reserved). *Winters* involved a non-navigable stream within a reservation.

112.    WEDNR's assertion of rights under *Winters* presents a federal question that cannot be adjudicated in tribal court.

113.    WEDNR has taken the position in the Tribal Court Action that it has exclusive and preemptive jurisdiction over the water rights to the Wild Rice River: "as it relates to water rights provided to the Band by federal treaty, State regulatory authority [. . .] is preempted and of 'no force and effect'[…][T]he State of Minnesota's actions in this

25

area are preempted as they relate to waters on and appurtenant to the Reservation to which the Band has federally reserved water property rights." (Ex. 9 at 4.)

114.   In adopting the Water Protection Ordinance, the White Earth RBC stated it had "obtained federally protected property rights to a sufficient quantity and quality of water to fulfill the purposes of the Reservation now and into the future, *United States v. Winans*, 198 U.S. 371 (1905); *Winters v. United States*, 207 U.S. 564, 577 (1908)." (Ex. 2 at 1.)

115.   The Water Protection Ordinance was adopted by the White Earth RBC on the basis that *Montana v. United States*, 450 U.S. 544, 565-66 (1981) granted the Band the authority to promulgate and enforce the ordinance against non-members and their fee lands. *Id.* Thus, the Ordinance assumes that the operation of any high-capacity wells and high-capacity pumps within the Reservation always meets the second *Montana* exception, which requires a showing of "catastrophic harm" to tribal government. *Plains Commerce Bank*, 554 U.S. at 341.

116.   The design of the Water Protection Ordinance requires a permit from the White Earth Band and the payment of an initial $5,000 fee (and potentially more) to obtain a permit for the installation of a high-capacity pump. Accordingly, a non-member is subject to the Ordinance without any judicial determination of whether the second *Montana* exception is satisfied.

117.   With regard to Mr. Vipond, WEDNR is seeking to hold Plaintiff in violation of the Water Protection Ordinance by its tribal court suit wherein Mr. Vipond has not

installed a high-capacity pump, and his only action has been to obtain a State permit that would allow him to do so, should he decide to install the pump.

118.   The criteria in *Montana v. United States* cannot be met by WEDNR in seeking jurisdiction over Mr. Vipond and his fee lands simply because Mr. Vipond has obtained a State permit for the activity. To the contrary, by obtaining a State permit for a high-capacity pump, a nearly insurmountable presumption has been created that the WEDNR cannot meet the second *Montana* criteria. The State-permitted activity could not imperil the health and safety of the Band because the MDNR issued the permit after considering and conditioning the permit on criteria that address and prevent injury to the health, welfare and political integrity of the White Earth Band and its members. Furthermore, by failing to provide comment during the MDNR permitting process, although extensions were granted and the WEDNR was offered additional time to provide comments, the WEDNR waived any objections it has to the activities permitted by the MDNR permit issued to Mr. Vipond.

## EXHAUSTION IS NOT REQUIRED

119.   Exhaustion of tribal court remedies is not required. Exhaustion is only a prudential rule, not a prerequisite, for this Court to exercise jurisdiction. *Strate v. A-1 Contractors*, 520 U.S. 438, 453 (1997).

120.   Exhaustion is not required where it would be futile or serve no purpose other than to delay resolution of this action. *Id*. at 459 n.14.

121.   WEDNR's request for a five-day hearing to determine jurisdiction and its approval by the Tribal Court effectively requires Mr. Vipond to litigate the merits of the

27

case before a determination on whether WEDNR has jurisdiction over him is made. This places a tremendous financial burden on Mr. Vipond when the issue will need to be re-litigated in a forum where the State can be made a party.

122.   Here, exhaustion is not required and would be futile for the following reasons:

(a)   The White Earth RBC, in adopting the Water Protection Ordinance, has already determined that it is applicable to non-members and their fee lands under the *Montana* criteria. The tribal court cannot reach a contrary result;

(b)   The structure of the White Earth Water Protection Ordinance presumes jurisdiction by requiring permitting and the payment of monies before any determination is made by WEDNR as to whether or not to issue a permit;

(c)   The allocation of water is necessarily intertwined with the *Montana* analysis and the application of the *Winters* doctrine;

(d)   The State of Minnesota has exclusive jurisdiction over the Wild Rice River;

(e)   The McCarran Amendment does not provide for adjudication of non-member and State water interests in tribal court;

(f)   WEDNR claims it has exclusive jurisdiction over the Wild Rice River, making the State of Minnesota a necessary and indispensable party, and the State cannot be sued in tribal court;

(g)   The nature and extent of WEDNR's claim to federally protected property rights in the water is a question of federal law that must be determined prior to any allocation, and cannot be determined in tribal court;

(h)   Determination of the applicability of the *Winters* doctrine, under federal law, applies to WEDNR's interests in the Wild Rice River, is a federal question;

(i)   The State of Minnesota was given jurisdiction over the Wild Rice River in 1858 prior to the creation of the White Earth Reservation in 1867, and the 1867 Treaty did not preempt the State's interest in the beds of navigable waters, which is a question of federal law;

(j)    The issue of sovereign authority over the Wild Rice River is intertwined with the application of *Montana* and *Winters*;

(k)    The court here has already shown that it is not neutral in this matter, granting the motion for temporary injunction before the time had run for Mr. Vipond to answer, and accepting that the tribal court had jurisdiction over this matter when the parties dispute it as a matter of law;

(l)    In its order granting WEDNR's motion for preliminary injunction, the tribal court found that WEDNR was entitled to relief under the *Winters* doctrine;

(m)    These matters would need to be reheard in a forum where the State could be a participant in the litigation, which is not in the spirit of judicial economy, and would be a waste of resources of the parties and the court; and

(n)    Exhaustion is not required where necessary and indispensable parties, including the State of Minnesota, have not been joined in the tribal court action and cannot be joined in a tribal court action.

## COUNT I

### For Declaratory and Injunctive Relief

123.    Mr. Vipond incorporates the allegations of Paragraphs 1-122.

124.    Pursuant to 28 U.S.C. § 2201, this Court has jurisdiction to enter judgments declaring the rights and privileges of parties before it.

125.    There is an actual controversy between Mr. Vipond and WEDNR concerning whether the White Earth Tribal Court has jurisdiction over Mr. Vipond and subject matter jurisdiction over the claims pled in the Tribal Court Action.

126.    A judgment from this Court that the tribal court lacks jurisdiction over Mr. Vipond or lacks subject matter jurisdiction over the Tribal Court Action will resolve the dispute between the parties concerning the tribal court's jurisdiction.

127. The State of Minnesota owns the bed below the natural ordinary low water levels of navigable waters within the state. *See Lamprey v. State*, 53 N.W. 1139 (1893); *United States v. Holt State Bank*, 270 U.S. 49 (1926).

128. The Wild Rice River is a navigable body of water that flows through the boundaries of the White Earth Reservation and connects to the Red River of the North that crosses State and national boundaries.

129. MDNR issued a permit for Mr. Vipond to operate a high-capacity pump on his land, pumping water from the Wild Rice River to irrigate his farmland. Mr. Vipond applied for the appropriate permit and obtained said permit following the State's standard permitting process. MDNR issued Mr. Vipond's permit following the permitting process.

130. The State of Minnesota is a necessary and indispensable party required to be joined, as the State has sovereign authority, including regulatory authority and jurisdiction, over navigable bodies of water within the boundaries of the State, regardless of whether the body of water flows through Indian country.

131. WEDNR's assertion of 'federal water rights' requires adjudication of those rights in federal or state court. WEDNR raised the issue of whether Minnesota's sovereign authority and jurisdiction over navigable bodies of water within the State is preempted by the White Earth Band of Ojibwe's federal reserved water rights is an issue raised by WEDNR in the Tribal Court Action, and rendering a judgment in the absence of the State would be enormously prejudicial to its sovereign interest in its water rights. *See Hood ex. Rel Mississippi v. City of Memphis, Tenn.*, 570 F.3d 625, 633 (5th Cir. 2009); *see also* the Senate Judiciary Committee Report regarding the McCarran Amendment, S. Rep. No. 755,

82nd Cong., 1st Sess. 2, at 4-5 (1951) ("[i]n the administration of and the adjudication of water rights under State law the State courts are vested with the jurisdiction necessary for the proper and efficient disposition thereof, and by reason of the interlocking of adjudicated rights on any stream system, any order or action affecting one right affects all such rights. Accordingly, all water users on a stream, in practically every case, are interested and necessary parties to any court proceedings.").

132.   The tribal court lacks jurisdiction over the State of Minnesota as the State has sovereign immunity from suit in tribal court on the claims pled by WEDNR.

133.   Mr. Vipond is not required to exhaust his remedies in the tribal court because MDNR is a required party to be joined and because the tribal court lacks jurisdiction over the State. *See Nevada v. Hicks*, 533 U.S. 353, 369 (exhaustion of tribal court remedies not required when "'it is plain that no federal grant provides for tribal governance of non-members' conduct on land covered by *Montana*'s main rule' so the exhaustion requirement 'would serve no purpose other than delay.'") (citing *Strate*, 520 U.S. at 459-60 and n.14.). Mr. Vipond is further not required to exhaust his remedies in tribal court for the reasons set forth above, including ¶¶ 119-122.

134.   Alternatively, Mr. Vipond has already exhausted his remedies in tribal court. White Earth District Court Judge DeGroat found that the tribal court had jurisdiction when he granted WEDNR's motion for preliminary injunction against Mr. Vipond. Judge DeGroat held that the tribal court had jurisdiction both under White Earth Judicial Code and the *Winters* doctrine. (Ex. 5 at 1.) The White Earth Court of Appeals did not vacate Judge DeGroat's injunction, but rather converted it into a temporary restraining order. (Ex.

31

7 at 4.) The White Earth Court of Appeals thus necessarily affirmed the findings of the tribal court on jurisdiction in order to find that the Court has authority to issue a temporary restraining order over Mr. Vipond. Further proceedings in tribal court would be futile.

135.   Judicial economy favors adjudication of the jurisdictional claims by WEDNR over Mr. Vipond in federal or state court where the State can be joined as a necessary and indispensable party.

136.   By failing to comment when MDNR reached out to the White Earth Band during the review of Mr. Vipond's permitting application, WEDNR has waived any claim that the State pumping permit authorizing water pumping activity meets the second *Montana* exception for jurisdiction over non-member activities on fee lands. *Plains Commerce Bank*, 554 U.S. at 341 (for the second *Montana* exception to apply, the tribe may not be merely injured by the conduct it seeks to challenge; the impact must be catastrophic for tribal self-government).

137.   As there are no Band-owned lands nor tribal-member-owned lands downstream of the proposed pumping site, the protected interests of the Band will not be "imperiled" by the State-permitted pumping activities. The State-permitted pumping activities would not impact 99.92% of the Wild Rice River drainage area and 98.7% of the stream length.

138.   Mr. Vipond is entitled to a declaration that the tribal court lacks subject matter jurisdiction to hear the Tribal Court Action.

139.   Mr. Vipond is entitled to a declaration that when the State of Minnesota, after a process that allows for comment and input from tribal government as well as others,

32

permits water pumping activity from a navigable body of water for use on non-member fee lands, the pumping activity cannot meet the second *Montana* exception for tribal court jurisdiction over a non-member for activities on fee lands.

140.     Mr. Vipond is entitled to an injunction against any further proceedings in the Tribal Court Action.

**WHEREFORE**, Mr. Vipond seeks a judgment:

A.     Declaring that the tribal court lacks jurisdiction over Mr. Vipond and lacks subject matter jurisdiction to hear the Tribal Court Action;

B.     Declaring that when the State of Minnesota permits water pumping activity from a navigable body of water for use on non-member fee lands, the pumping activity cannot meet the second *Montana* exception for tribal court jurisdiction over a non-member for activities on fee lands;

C.     Enjoining the Defendants from any further proceedings in the Tribal Court Action;

D.     For such other and further relief as the Court deems just and equitable; and

E.     Awarding Mr. Vipond his costs in this matter.

Respectfully submitted,

**NOLAN, THOMPSON, LEIGHTON & TATARYN, PLC**

Dated:  August 2, 2024        By:   *s/ Randy V. Thompson*

    Randy V. Thompson (#122506)
    Courtney E. Carter (#390284)
1011 First Street South, Suite 410
Hopkins, Minnesota 55343
Tel: (952) 405-7171
Email:  rthompson@nmtlaw.com
Email:  ccarter@nmtlaw.com

**HANSON & LIEBL LAW OFFICE, P.C.**

By:  *s/ Levi Liebl*

    Levi Liebl (#0402573)
P.O. Box 340
Mahnomen, MN 56557
Tel: (218) 935-2266
Email:  levi@mahnomenlaw.com

*Attorneys for Plaintiff David Vipond*

34