EXHIBIT A

# White Earth Band of Ojibwe
## Tribal Court

Date:              July 28, 2026
Regarding Case:    Appeal for Case No. GC2023-00001
File No.           AP2025-00003

To:

Cory J. Albright
Jane G. Steadman
Josh Handelsman
Riyaz Kanji
Attorneys for WEDNR              via e-mail

Levi Libel
Randy Thompson
Courtney Carter
Attorneys for Respondent         via e-mail

Enclosed Documents: **Opinion and Order**

By: _____

Jodie Erb, Clerk of Court
White Earth Tribal Court
PO Box 289
White Earth, MN 56591
Phone: (218) 935-3526
Fax: (218) 983-3294
Jodie.Erb@whiteearth-nsn.gov

WHITE EARTH BAND OF OJIBWE

IN TRIBAL COURT OF APPEALS

White Earth Division of Natural Resources,

                                          Appeal No. AP2025-00003
                                          Tribal Court Case No. GC2023-00001

        Plaintiff/Appellant/Respondent,

v.                                           OPINION AND ORDER

David Vipond,

        Defendant/Respondent/Appellant.

---

Judges Soule, Scheffler Blaeser, Harrington.

**INTRODUCTION**

In this case, the White Earth Nation ("Nation") Department of Natural Resources ("WEDNR") sought a declaration that the White Earth Reservation Groundwater and Surface Water Protection Ordinance ("the Ordinance") applied to David Vipond, a nonmember. Mr. Vipond had a surface water pumping permit from the Minnesota Department of Natural Resources ("MNDNR") to pump large quantities of water from the Wild Rice River to irrigate his fee land within the boundaries of the White Earth Reservation ("Reservation"). WEDNR contended that Mr. Vipond must apply for a permit under the Ordinance before engaging in any pumping activity. The Tribal Court held that the Nation had jurisdiction to adopt the Ordinance, but that the Tribal Court lacked jurisdiction to enforce it against Mr. Vipond, given the specific circumstances of his proposed water appropriation.

We conclude that the Nation has regulatory jurisdiction to enact the Ordinance applicable to members and nonmembers, the Tribal Court has adjudicatory jurisdiction to determine the claims against Mr. Vipond herein, and the Nation may require Mr. Vipond to obtain a permit (or Exception) from the WEDNR under the Ordinance before any pumping activity.

We also conclude that we need not address the Tribal Court's findings of fact pertaining to the individual impacts of Mr. Vipond's proposed pumping activity or the navigability of the Wild Rice River; the State of Minnesota is not a necessary party requiring dismissal; and the Tribal Court correctly denied Mr. Vipond's motion for summary judgment arguing that the Ordinance is invalid absent the United States Secretary of Interior's review.

1

## FACTUAL AND PROCEDURAL BACKGROUND

The Ordinance

The White Earth Reservation Business Committee ("RBC") enacted the Ordinance on May 5, 2023. The RBC amended the Ordinance on June 12, 2024 and on May 30, 2025. WEDNR Addendum (2) at 181, WEDNR Addendum at 001-2. The Ordinance, as amended, applies to "high-capacity wells and high-capacity pumps within the exterior boundaries of the White Earth Reservation." Ordinance, § 3.1. The Ordinance requires landowners intending to install a high-capacity well or high-capacity pump on the Reservation to have a permit (or Exception) issued by the WEDNR. While the Ordinance initially required *existing* high-capacity wells and high-capacity pumps "permitted by the Minnesota Department of Natural Resources" to obtain a permit from White Earth, such requirement as to existing uses was suspended by the June 2024 amendments to the Ordinance. WEDNR Addendum (2) at 181.

Under the current version of the Ordinance, the WEDNR has five options during and after the permitting process. It can:

1. Grant a "Special Exception" with respect to the permitting process if the potential applicant (1) so requests, (2) can establish that the required permit application information is available through "alternative means or is not necessary for an evaluation of" the applicant's operation, and (3) can establish that the "public health, safety and welfare of White Earth Tribal Members and natural resources on the White Earth Reservation will not be adversely affected" by the applicant's operation. Ordinance § 7.6.
2. Request additional information if the permit application is incomplete or fails to provide sufficient information for the WEDNR to determine whether the pump meets the standards in the Ordinance. *Id.* § 6.3(a).
3. Upon review of a completed permit application,
   a. grant the permit without conditions. *Id.*, § 6.3(c).
   b. grant the permit with conditions, such as "pumping rate limitations, pumping timing or duration restrictions, limits on amount of water withdrawn during a given period, apportionment among multiple Permit holders in a geographic area and monitoring requirements." *Id.*
   c. deny the permit. *Id.*

The Ordinance further provides that a person "affected by a Permit decision, notice, order, or other final action taken pursuant to this Ordinance may request and shall be granted an evidentiary hearing on the matter before the White Earth Tribal Court." *Id.*, § 10.4(a).

Mr. Vipond's Proposed Pumping Activity

Mr. Vipond operates a farm on fee land owned by him on the Reservation. He has raised corn, edible beans, soybeans, and wheat on his farm. FOF[1] 12.3. Mr. Vipond has never used supplemental irrigation on his farm. FOF 12.3. In August 2023, Mr. Vipond obtained a permit from the MNDNR, allowing him "to pump up to 65.2 million gallons of water per year from the Wild Rice River on the

---

[1] We refer to the Tribal Court's findings of fact in its Memorandum Decision and Findings of Fact/Conclusions of Law Regarding Regulatory and Adjudicatory Jurisdiction of Plaintiff Agency and Court dated October 14, 2025, as "FOF."

2

Reservation to irrigate 353 acres of farmland on the Reservation." FOF 12.1. Mr. Mr. Vipond represented in testimony before the Tribal Court that he more likely would pump only approximately 20 to 32.6 million gallons of water per year. FOF 12.4. Mr. Vipond has not applied for a permit under the Ordinance; thus, the WEDNR has not had an opportunity to evaluate Mr. Vipond's pumping activity under the framework set out in the Ordinance, nor has it had an opportunity to determine which of the five options set out above it should undertake.

Procedural Background

On June 30, 2023, and August 15, 2023, WEDNR sent notices to Mr. Vipond, notifying him "of the Band's Water Protection Ordinance and the Band's associated permit requirement for [Vipond's] proposed water appropriation," Complaint, August 23, 2023, ¶22, and "that he is prohibited from installing or operating a High-Capacity Pump on the Wild Rice River within the boundaries of the White Earth Reservation without first receiving a permit from the WEDNR," *id.* at ¶24.

After Mr. Vipond did not respond to the notices, WEDNR commenced an action against Mr. Vipond in the White Earth Tribal Court on August 23, 2023. The WEDNR's Complaint sought:

> (1) a declaration that Defendant may not install or operate a pump on the Wild Rice River that pumps more than 10,000 gallons of water per day or more than one million gallons of water per year (a "High Capacity Pump") within the geographic scope covered by the White Earth Reservation Groundwater and Surface Water Protection Ordinance, Resolution No. 057-22-017 ("Water Protection Ordinance") without a validly issued permit from WEDNR issued in accordance with the Water Protection Ordinance; (2) a declaration that the Water Protection Ordinance governs the extent of Defendant's right, if any, to pump water from the Wild Rice River for any purpose within the geographic scope covered by the Water Protection Ordinance; (3) an injunction enjoining Defendant from installing or operating a High-Capacity Pump on the Wild Rice River within the geographic scope covered by the Water Protection Ordinance without a validly issued permit from WEDNR issued in accordance with the Water Protection Ordinance.

Complaint, August 23, 2023, ¶1. On the same day, the WEDNR filed a Notice of Motion and Motion for Preliminary Injunction. Before the date by which Mr. Vipond was required to answer the Complaint, and without notice, any response from Mr. Vipond, or a hearing, the Tribal Court[2] issued an Order for Injunction as follows:

> IT IS THEREFORE ORDERED that, during the pendency of the above-captioned action, Defendant David Vipond is enjoined from installing or operating a high-capacity pump (defined as any pump that can pump more than 10,000 gallons of water per day or more than one million gallons of water per year) on the Wild Rice River within the geographic scope covered by the White Earth Reservation Groundwater and Surface Water Protection Ordinance, Resolution No. 057-22-017 (the "Water Protection Ordinance") absent a validly issued Permit from the White Earth Department of Natural Resources issued in accordance with the Water Protection Ordinance.

> This injunction will be removed, modified, or permanently issued only upon a joint motion of

---

[2] The Honorable David DeGroat initially presided over the Tribal Court proceedings.

the parties or as set forth in the final judgment for the above-captioned matter.

Order for Injunction, September 12, 2023.

Mr. Vipond filed a Special Appearance Answer on September 20, 2023, and a Special Appearance Answer to the Amended Complaint on October 17, 2023. There, Mr. Vipond alleged that the "White Earth Reservation Business Committee [did not have] jurisdiction to enact an ordinance that exercises authority over Defendant, his land, and the waters in question." Special Appearance Answer, October 17, 2023, ¶8. In multiple other ways, Mr. Vipond alleged that the White Earth Nation lacked jurisdiction to enforce the Water Protection Ordinance against him or his water use: "[T]he land for which Defendant sought and obtained a permit from the Minnesota DNR for water pumping from the Wild Rice River for irrigation purposes is non-member fee owned land." *Id.* ¶32. "Plaintiff lacks jurisdiction over Defendant or his land." *Id.* ¶33. "Plaintiff lacks jurisdiction over Defendant for his activities on fee owned lands, including waters adjacent thereto on which Defendant has riparian rights, under *United States v. Montana* and other Supreme Court precedent, unless Plaintiff can meet one of the two exceptions for jurisdiction under *United States v. Montana*. Plaintiff has failed to plead or prove that either of the *Montana* exceptions to jurisdiction over Defendant are applicable here." *Id.* ¶34. "The pumping activities of Defendant pursuant to a Minnesota DNR permit, even if engaged in by Defendant, do not threaten or have an impact on the health and welfare of the White Earth Band and its members." *Id.* ¶42. "The Court lacks subject matter jurisdiction for the matters alleged in the Amended Complaint." *Id.* ¶45.[3]

## The First Appeal

Mr. Vipond filed a Notice of Appeal of the Order for Injunction on October 10, 2023. In response to Mr. Vipond's Notice of Appeal, this Court stated that it was "troubled that a preliminary injunction was issued against [Mr. Vipond] before the date by which he was required to answer the complaint, without notice, an opportunity to file a response, or a hearing on the motion." Order, October 24, 2023, Case No. GC2023-00001, p. 2. We noted "that [Mr. Vipond] challenges the Court's authority to exercise subject matter jurisdiction over [WEDNR's] claims under the *Montana* doctrine and other federal law. This issue is not addressed in the Court's Order for Injunction. Without detailed findings on this issue and other criteria for whether to grant a preliminary injunction, this Court cannot conduct meaningful appellate review." *Id.* at p. 3. This Court treated "the order . . . as a temporary restraining order and the parties may litigate in the Tribal Court whether [WEDNR] is entitled to a preliminary injunction." *Id.* This Court dismissed Mr. Vipond's appeal without prejudice and ordered:

2. The Tribal Court's Order for Injunction shall be treated as a temporary restraining order under Rule XI of the Rules of Civil Procedure. The injunction will remain in place pending further proceedings of the Tribal Court as described herein.

---

[3] The WEDNR amended its complaint on October 5, 2023. Mr. Vipond filed a Special Appearance Answer to the Amended Complaint on October 17, 2023. After the first appeal in this case, discussed below, the WEDNR filed a motion for leave to file a Second Amended Complaint on or about March 28, 2024, which motion was granted. Mr. Vipond filed a Special Appearance Answer to the Second Amended Complaint on May 9, 2024.

4

3. [WEDNR's] motion for preliminary injunction shall be set for a hearing on a date within 30 days of issuance of this order (unless the parties or the Court agree to extend that period). Respondent may rely on its prior submissions or may provide additional support for it [sic] motion. [Mr. Vipond] shall be given an opportunity to file a memorandum and affidavits in opposition to the motion.

4. In determining whether a preliminary injunction should be issued, the Tribal Court shall enter detailed findings on jurisdiction and other criteria for issuance of an injunction.

*Id.* at p. 4.

Proceedings on Remand

The parties agreed to extend this Court's 30-day deadline for determining whether a preliminary injunction should issue. The parties engaged in discovery on jurisdictional facts. The Tribal Court[4] held an evidentiary hearing on February 24-25, 2025, "to enable [it] to determine the facts underlying the issue of this Court's jurisdiction, as well as the regulatory jurisdiction of the Plaintiff to apply the ordinance to the Defendant." Memorandum Decision, October 14, 2025, p. iv. The Tribal Court asked the parties to submit proposed findings of fact and brief 11 issues, including:

8. In a case such as this where the [Nation] purports to regulate all non-Indian high-capacity pumping on the White Earth reservation is the legal inquiry under the second prong of *Montana* whether the regulation is necessary to protect the political integrity, economic security and or health and welfare of the [Nation], as impacted by all users, or only whether the Defendant's proposed high-capacity pumping meets the *Montana* standard? . . .

10. Is [sic] the challenged future conduct of the Defendant, in isolation without regard to other high-capacity water users on the reservation, satisfy the second prong of *Montana* for this Court to assert adjudicatory jurisdiction over this action seeking to enjoin his use of the MN DNR Permit to extract surface waters.

11. Could the Court uphold the White Reservation Groundwater and Surface Water Protection Ordinance [sic], as a valid exercise of civil regulatory authority insofar as it regulates non-Indian high capacity pumpers under *Cooley* and *Montana*, but find that it lacks adjudicatory jurisdiction over the Defendant in this case under *Plains Commerce* and *Strate* because his desire to pump near the western boundary of the reservation is too attenuated to the expressed goals of the Water Protection Ordinance.

*Id.* at p. v (italicizations added).

The Tribal Court Opinion on Remand

The Tribal Court issued its decision—Memorandum Decision and Findings of Fact/Conclusions of Law Regarding Regulatory and Adjudicatory Jurisdiction of Plaintiff Agency and Court—on October

---

[4] The Honorable B. J. Jones presided over this matter after Judge DeGroat recused himself following Mr. Vipond's filing of a civil lawsuit in federal court, discussed below.

5

14, 2025. The narrative opinion consists of 40 pages (i – xl) and the Findings of Fact and Conclusions of Law comprises 95 pages.

The Tribal Court applied the standards established in *Montana v. United States*, 450 U.S. 544 (1981), to determine whether the Nation had jurisdiction to enforce the ordinance against Mr. Vipond.

The Tribal Court concluded that the Nation had regulatory jurisdiction to adopt an ordinance that applied to water uses on the Reservation by members and non-members. "The Nation is acting squarely within the bounds of recognized authority in seeking to protect the treaty rights essential to its very way of life through the regulation of non-Indian consumptive water uses on the Reservation." Memorandum Decision, p. xxiv.

> The only approach consistent with case law and the core purpose of the second *Montana* exception in allowing for sensible tribal governance in safeguarding core tribal interests is for tribal regulatory programs to be assessed against the threat posed by the class of activities that tribes seek to regulate. This is nowhere truer than with respect to water, given its critical importance and unitary nature. Here, as established in the Nation's Proposed Findings of Fact, WEDNR has demonstrated that high-capacity appropriations on the Reservation pose a substantial threat to the tribe's political integrity, economic security, and health and welfare, amply justifying its class-wide regulation of such appropriations.

Memorandum Decision, p. xxxv.

But, after finding that the Nation had "regulatory authority to enact the Ordinance in play here," the Tribal Court concluded that it needed to determine "whether this Court can adjudicate the Defendant as being covered by that Ordinance." Memorandum Decision, p. xxix.

The Tribal Court stated that it would adopt a

> middle ground that would be respectful of the [Nation's] regulatory authority in such a vital aspect of its ecosystem and culture while being cognizant of the limitations upon the Defendant's use of waters that run through his fee lands. . . . [T]he Court finds that under the second prong of *Montana*, in assessing the Court's adjudicatory jurisdiction in a case where the Court upholds the regulatory authority of the [Nation] to regulate all persons and entities that meet a threshold of water use, the Court must find that the non-Indian user's proposed conduct on his privately-owned fee land would **substantially** contribute to the harm that is being regulated by the [Nation] and for other non-Indian users would contribute to the harm being regulated.

Memorandum Decision, p. xxxviii (emphasis in original). The Tribal Court then concluded:

> [B]ased upon the findings of fact herein, the Court does not find it has adjudicatory jurisdiction over the Defendant to enjoin him from using his current permit from the Minnesota DNR to extract the water for irrigation of his land purposes. His future use is too attenuated from the legitimate objectives expressed in the Ordinance and testified to at the jurisdictional hearing. His use of the Minnesota DNR permit would not substantially impact ricing on the White Earth reservation as there is no record of wild rice downstream from his

6

fee land. . . . The Court makes other findings about his proposed use herein that demonstrate that . . . the location of his proposed discharge pump, coupled with the built-in restrictions on the use of his Minnesota DNR permit, convince this Court that his use does not substantially contribute to the concerns expressed in the Ordinance.

Memorandum Decision, p. xxxix. The Tribal Court thus dismissed the action against Mr. Vipond based on lack of adjudicatory jurisdiction.

Mr. Vipond's Motion for Summary Judgment

During the pendency of the matter before the Tribal Court, Mr. Vipond filed a motion for summary judgment arguing that the Ordinance was invalid because the Nation failed to submit it for approval by the United States Department of Interior. Specifically, Mr. Vipond argued that under the Minnesota Chippewa Tribe's Constitution, Article VI, § 1(d), any ordinance that seeks to "levy licenses or fees on nonmembers are subject to review by the Secretary of the Interior." Vipond Rebuttal Addendum at 71 (Vipond's Mem. In Supp. of Motion for Summary Judgment).

On October 14, 2025, the Tribal Court denied Mr. Vipond's motion for summary judgment, concluding that the Ordinance was not uniquely for the purpose of levying fines or licenses on non-members; rather, the Ordinance regulated conduct on the reservation irrespective of tribal membership. Memorandum Decision and Order Denying Defendant's Motion for Summary Judgment, October 14, 2025, at 4.

The Federal Court Case

While the Tribal Court matter was pending, on August 2, 2024, Mr. Vipond also filed a complaint against Judge David DeGroat in his official capacity as judge of the White Earth Tribal Court,[5] and Dustin Roy, in his official capacity as head of the WEDNR, in the United States District Court for the District of Minnesota. *Vipond v. Degroat*, No. 24-cv-3125, 2025 U.S. Dist. LEXIS 39104, at *1, 5 (D. Minn. Mar. 5, 2025) (*Vipond I*), *aff'd*, 166 F.4th 694 (8th Cir. 2026) (*Vipond II*). Mr. Vipond sought, among other things, a declaration that the Tribal Court lacked jurisdiction over him and lacked subject matter jurisdiction, and an injunction against further Tribal Court proceedings. *Id.* at *5.

As a threshold issue, the District Court considered the exhaustion doctrine, that is, that a "federal court should stay its hand until tribal remedies are exhausted." *Id.* at *10. Mr. Vipond contended that an exception to the exhaustion doctrine—that the Tribal Court plainly lacked jurisdiction and assertion of tribal authority serves no other purpose than delay—applied. *Id.* The District Court disagreed, addressing aspects of tribal court jurisdiction in determining whether such jurisdiction was plainly absent. *Id.* at *11-12. The District Court acknowledged both Mr. Vipond's and the Nation's arguments, commenting that Mr. Vipond's water extraction would be "considerable" and that the Nation uses the river from which Mr. Vipond's withdrawals would stem "in several ways that are important to the [Nation's] economic activities and its societal functions," while noting Mr. Vipond's contention that his pumping would not impact the River or meet the threshold for tribal court jurisdiction under *Montana*. *Id.* at *11. Nevertheless, the District Court concluded that tribal

---

[5] After filing of the federal case, Judge DeGroat recused himself from further Tribal Court proceedings in this matter. The Tribal Court case was reassigned to the Honorable B.J. Jones.

court jurisdiction was not plainly lacking; thus, it held that Mr. Vipond must exhaust his tribal court remedies before pursuing the matter in federal court. *Id.* at *14.

The Eighth Circuit Court of Appeals affirmed. *Vipond II*, 166 F.4th at 702. As did the District Court, the Eighth Circuit considered the exhaustion doctrine and whether the Tribal Court plainly lacked jurisdiction. *Id.* at 699. On one hand, the Eighth Circuit concluded that the Nation could not show that Mr. Vipond's proposed pumping *standing alone* would justify regulation. *Id.* at 700-701. Nevertheless, the Eighth Circuit observed that the Supreme Court in *United States v. Cooley*, 593 U.S. 345 (2021), considered whether a general class of conduct in the aggregate would pose "'catastrophic' threats" to the Nation sufficient to confer tribal jurisdiction over nonmember conduct on a reservation. *Id.* at 701. The Eighth Circuit concluded that, because the law is "murky" on whether the jurisdictional question involved a class of conduct or individual conduct, and because the Nation "advanced a non-frivolous case that the increased extraction of water by new high-capacity pumps on the reservation will deplete resources that are vital to the [Nation's] health and welfare," Mr. Vipond must exhaust his tribal court remedies before seeking relief in federal court. *Id.* at 701.

### Appellate Court Proceedings in Tribal Court Case

Both Mr. Vipond and the WEDNR appealed the Tribal Court's October 14 decision on November 12, 2025. We extended deadlines for appellate filings on January 9, 2026. The parties filed their respective opening briefs on January 30, 2026, response briefs on February 27, 2026, and rebuttal briefs on March 20, 2026. Oral argument was heard on May 28, 2026.

### STANDARD OF REVIEW

"The extent of tribal court subject matter jurisdiction over claims against nonmembers of the tribe is a question of federal law which we review de novo." *Minnesota DNR v. Manoomin*, No. AP21-0516, at 5 (White Earth Ct. App. Mar. 10, 2022) (quoting *Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe*, 609 F.3d 927, 934 (8th Cir. 2010)).

### THE WHITE EARTH BAND HAD REGULATORY JURISDITION TO ENACT THE WATER PROTECTION ORDINANCE

### Subject Matter Jurisdiction

We explained the contours of an Indian tribe's subject matter jurisdiction, including the *Montana* doctrine, extensively in *Manoomin*. There, we noted that the outer bounds of a tribe's subject matter jurisdiction over nonmembers is governed by federal law. *Id.*, p. 6-7 (citing *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 324 (2008); *MacArthur v. San Juan County*, 497 F.3d 1057, 1066 (10th Cir. 2007); *National Farmers Union Ins. Co. v. Crow Tribe of Indians*, 471 U.S. 845, 851 (1985); *Boozer v. Wilder*, 381 F.3d 931, 934 (9th Cir. 2004) (stating that whether tribal court maintains jurisdiction over nonmember requires looking to federal law)).

The *Montana* doctrine is the foundation for determining tribal jurisdiction over nonmembers. *Id.*, p. 7 (citing *Montana v. United States*, 450 U.S. 544 (1981)). As we explained in *Manoomin*:

8

The *Montana* Court acknowledged that, within a reservation, Tribes have "inherent sovereignty" to address "what is necessary to protect tribal self-government or to control international relations," and may "punish tribal offenders," "determine tribal membership, . . . regulate domestic relations among members, and . . . prescribe rules of inheritance for members." The Court concluded, however, that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." The Court held that there were two situations in which a Tribe may exercise authority over a nonmember:

> To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. [Citations omitted.] A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

> The "consensual relationship" situation, justifying tribal jurisdiction, is often referred to as the "first *Montana* exception," and the "threaten . . . the political integrity . . ." situation is referred to as the "second *Montana* exception."

*Manoomin*, p. 7 (quoting *Montana*, 450 U.S. at 564-66).

In *Manoomin*, we concluded that *Montana's* second exception required a showing that a nonmember engaged in activities *within the reservation* to invoke subject matter jurisdiction in the tribal court. *Id.*, p. 17. But because no evidence in that case showed that the MNDNR officials engaged in allegedly unlawful activities within the reservation, we concluded that the Tribal Court lacked subject matter jurisdiction over the lawsuit. *Id.*

Scope of Inquiry Under Second *Montana* Exception

At issue here is whether the Nation may exercise jurisdiction over Mr. Vipond under the second *Montana* exception. Specifically, the parties dispute the proper scope of inquiry under that exception. Mr. Vipond argues that courts must evaluate only the conduct of the individual nonmember that the tribe seeks to regulate or adjudicate. Vipond Opening Br. at p. 10-11. In contrast, the WEDNR, and the United States as amicus (in its briefing before the Tribal Court), assert that courts must evaluate the class of conduct into which the individual's conduct fits. WEDNR Opening Br. at p. 13; U.S. Amicus Br. at p. 10 (WEDNR Addendum, p. 51). We agree with the WEDNR and United States.

Since *Montana* was decided in 1981, courts have frequently addressed whether tribes have authority over non-member conduct on tribal land and fee land under the second *Montana* exception. The *Montana* decision itself demonstrates the scope of inquiry for the second exception. There, the Court addressed the Crow Tribe's authority "to regulate hunting and fishing by non-Indians on lands within its reservation owned in fee simple by non-Indians." *Montana*, 450 U.S. at 547. The tribe sought to prohibit "all hunting and fishing by nonmembers . . . on non-Indian property within reservation boundaries." *Id.* It is clear that the Crow Tribe sought to regulate—and thus that

9

the *Montana* decision addressed—more than a single nonmember's conduct; rather, the tribe's resolution prohibited a class of conduct, and the Court analyzed whether that class of conduct "so threaten[ed] the Tribe's political or economic security as to justify tribal regulation." *Id*. at 566. The Court concluded that the class of conduct did not pose a sufficient threat to tribal political integrity, economic security, health, or welfare to justify tribal regulation. *Id*.

Subsequent cases align with this class-wide approach, even if they do not always conclude that tribal jurisdiction exists. For example, as in *Montana*, several cases have addressed whether tribes may regulate nonmember hunting and fishing on non-Indian (whether fee land or land taken by the United States) land within a reservation. *South Dakota v. Bourland*, 39 F.3d 868, 870-71 (9th Cir. 1994) (concluding that tribe lacked authority to regulate non-Indian hunting and fishing generally on land taken by the United States for dam construction); *Lower Brule Sioux Tribe v. South Dakota*, 104 F.3d 1017, 1023-24 (8th Cir. 1997) (concluding that tribe lacked authority to regulate nonmember hunting and fishing on fee land).

Similarly, and shortly after *Montana* was decided, the Ninth Circuit decided a case involving nonmember "use of the bed and banks of the south half of Flathead Lake" and whether such conduct met the second *Montana* exception. *Confederated Salish & Kootenai Tribes v. Namen*, 665 F.2d 951, 964 (9th Cir. 1982); *see also* U.S. Amicus Br., p. 9-10 (WEDNR Addendum, p. 50-51). Specifically, nonmembers of the tribes owned riparian land on the south half of Flathead Lake in Montana, which lies within the tribal reservation, operating a marina, including docks, a breakwater, and storage shed that extended into the banks and bed of the lake. *Confederated Salish & Kootenai Tribes*, 665 F.2d at 953. The tribes passed an ordinance regulating riparian structures on the south half of Flathead Lake. *Id*. at 954. The tribes sued the nonmembers, arguing that the structures trespassed on tribal land and violated the ordinance. *Id*. The Ninth Circuit Court of Appeals analyzed the issue as one determining tribal authority to regulate a class of conduct, describing the district court as deciding whether the tribes "had [] power to regulate the federal common law riparian rights of non-Indians who own reservation land," *id*. at 962, and reasoning that the tribes in that case were "in effect seeking to regulate non-Indians' use of tribal trust land," *id*. at 964. Most saliently, the court stated that the "conduct that the Tribes seek to regulate in the instant case—*generally speaking, the use of the bed and banks of the south half of Flathead lake*— has the potential for significantly affecting the economy, welfare, and health of the tribes" by "increas[ing] water pollution, damage[ing] the ecology of the lake, interfere[ing] with treaty fishing rights, or otherwise harm[ing] the lake, which is one of the most important tribal resources." *Id*. The court concluded that "the challenged ordinance [fell] squarely within the exception recognized in *Montana*" and held that the tribes had authority to apply the ordinance "to regulate the riparian rights of non-Indians owning land within the Flathead Reservation." *Id*. at 964-65. Had the court taken the individualized lens that Mr. Vipond advocates, its language would have been much narrower.

Most recently, the Supreme Court considered whether "ongoing threats" posed by nonmembers operating vehicles on roads—that is, non-Indian owned and maintained roads—within reservation boundaries met the threshold for tribal jurisdiction over nonmembers. *United States v. Cooley*, 593 U.S. 345, 351 (2021).[6] The Court included various threats among those it considered "ongoing

---

[6] In *Manoomin*, we described the conclusion in *Cooley* as follows: "The non-Indian's activity subject to tribal regulation (by the stop and search) occurred on the reservation and threatened the 'health or welfare of the tribe.'" *Manoomin*, p. 14 (citing *Cooley*, 593 U.S. at 351). We further stated, "We do not see *Cooley* as

threats"—"non-Indian drunk drivers, transporters of contraband, or other criminal offenders." *Id.* In other words, in its most recent word on the *Montana* standard, the Supreme Court, too, interpreted the second exception of *Montana* to use a class-of-conduct lens rather than an individualized lens. *Id.*; see *Vipond II*, 166 F.4th at 701 (noting that *Cooley* decision found "sufficient that [Cooley's] conduct fit within a general class of 'ongoing threats' to tribal 'health or welfare,' . . . [leaving] open the possibility that the [second *Montana*] exception confers tribal jurisdiction over nonmembers engaged in on-reservation conduct that, in the aggregate, poses 'catastrophic' threats")[7]; see *also* U.S. Amicus Br. p. 10 (WEDNR Addendum, p. 51) (suggesting that *Cooley* took class of conduct view).

In other cases citing the *Montana* standard, courts have analyzed classes of threats. For example, in *Strate v. A-1 Contractors*, 520 U.S. 438, 457-58 (1997), the Court stated that "those who drive carelessly" through a reservation "surely jeopardize the safety of tribal members." But the effect of the class of conduct of careless driving, according to the *Strate* Court, did not sufficiently "threaten or [have] some direct effect on the political integrity, the economic security, or the health or welfare of the tribe" to support tribal jurisdiction under the second *Montana* exception. *Id.*

In *Montana v. United States EPA*, 137 F.3d 1135 (9th Cir. 1998), the Ninth Circuit upheld an EPA regulation under which a tribe was granted authority to set water quality standards. The court concluded that the regulation correctly reflected the scope of tribal authority over pollutant discharges by nonmembers on non-Indian land within the reservation into waters generally—it did not analyze the tribe's authority as against each individual discharge; rather, it evaluated the propriety of tribal authority as against a class of conduct: discharge of pollutants into waters. *Id.* at 1139.

Likewise, in *Big Horn County Elec. Coop. v. Alden Big Man*, the district court concluded that shutoffs of heat in winter on both trust and non-Indian fee land had a direct effect on health and welfare of tribe sufficient to justify tribal regulation of a non-Indian utility. 526 F. Supp. 3d 756 (D. Mont. 2020), *aff'd on other grounds*, No. 21-35223, 2022 U.S. App. LEXIS 6349 (9th Cir. Mar. 11, 2022) (concluding that first *Montana* exception applied and declining to address other issues), *cert.*

---

expanding the second *Montana* exception." *Id.* These statements arguably could be interpreted to align with an individualized scope of inquiry under the second *Montana* exception. But it was not this Court's intent or role in *Manoomin* to determine the proper scope of inquiry under the second *Montana* exception. Indeed, that issue was not presented in *Manoomin* and we did not analyze, let alone decide, it. And on further analysis in light of the issues raised in the present appeal, we conclude that *Cooley* supports the class of conduct inquiry, as described above. Any implication to the contrary in *Manoomin* is not binding or persuasive.

[7] In *Vipond II*, the court offered *Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125 (8th Cir. 2019) as supporting the individual conduct jurisdictional lens. *Vipond II* stated that *Kodiak* addressed "parties' specific failure to pay royalties" and concluded that such failure did not "'imperil the subsistence of the tribal community.'" *Vipond II*, 166 F.4th at 701. In *Kodiak*, tribal members sued "numerous non-tribal oil and gas companies" in tribal court over their practice of "flaring natural gas from oil wells," which the tribal members deemed wasteful and for which they sought royalties. *Kodiak*, 932 F.3d at 1129, 1130. The *Kodiak* case stated: "Adjudicating disputes over the payment of royalties under a system for payment of such royalties wholly controlled by the federal government under federal law is not 'necessary to protect tribal self-government or to control internal relations.'" *Kodiak*, 932 F.3d at 1138. Thus, the *Kodiak* decision suggests consideration of the class of conduct, that is, the conduct of several oil and gas companies and payment of royalties generally in determining the applicability of the second *Montana* exception.

11

*denied* (Dec. 12, 2022). The district court did not analyze only the effect of the utility shutting of one tribal member's heat; rather, the district court analyzed the potential effects of shutting off heat on the reservation generally.

In *United States v. Anderson*, 736 F.2d 1358, 1363, 1365 (9th Cir. 1984), the Ninth Circuit addressed whether the state or tribe had authority to regulate surplus water use on a particular river that originated outside the reservation, crossed into the reservation, and then exited the reservation. The Court concluded that the state, rather than the tribe, had regulatory authority over surplus water use by nonmember fee landowners within the reservation, and that state regulation presented no adverse impact on the tribe. *Id.* But the court's analysis demonstrated the class-of-conduct lens: "the political and economic welfare of the Tribe will not suffer adverse impact from the state-regulated use of surplus waters by nonmembers on non-Indian lands." *Id.*

Notably, the respective courts in the foregoing decisions did not uniformly conclude that the tribe had regulatory or adjudicative jurisdiction despite the use of a class-of-conduct lens. What is evident from these cases is that the respective courts analyzed a class of conduct rather than only individual conduct.

Mr. Vipond points to *Evans v. Shoshone-Bannock Land Use Policy Comm'n*, 736 F.3d 1298 (9th Cir. 2013), as a case in which the Court looked to individual, rather than a class of, conduct to determine tribal jurisdiction. Vipond Response Br., p. 8-9. There, Evans, a nonmember, began construction of a single-family residence on his fee simple land. The Tribe sought to enforce its Land Use Policy Ordinance to require Evans to submit a building permit application and use contractors that obtained tribal business licenses. The Ninth Circuit held that the Tribe "lack[ed] the authority to regulate Evans' construction of a single-family house on non-Indian fee land." *Id.* at 1303. We regard *Evans* as an outlier. We have not located another case involving such a narrow conception of the second *Montana* exception. And *Evans* conflicts with the tenor of Supreme Court caselaw from *Montana* through *Cooley*. Indeed, as will be discussed below, even cases that appear to narrow tribal jurisdiction take the class-of-conduct lens that *Evans* incorrectly forewent.

For example, at first glance, *Atkinson Trading Co. v. Shirley*, 532 U.S. 645 (2001) appears to take an individualized lens: "We fail to see how petitioner's operation of a hotel on non-Indian fee land 'threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.'" *Id.* at 658 (quoting *Montana*, 450 U.S. at 566)) and n.12. However, the underlying conduct was occupancy of the hotel on non-Indian land, including non-Indian occupant reliance on services provided by the tribe. The Court analyzed that reliance in the aggregate. *See id.* at 655 (noting that all non-Indian fee lands within a reservation benefit from the "'advantages of civilized society' offered by the Indian Tribe"). Further, the Court noted that the tax fell upon all guests at the hotel, who paid approximately $84,000 in taxes to the Navajo Nation annually. *Id.* at 648. In other words, *Atkinson* does not stand for the proposition that the *Montana* standard looks to individual conduct.

Several additional considerations support the class-of-conduct lens as the proper scope of inquiry under *Montana*. First, federal courts have consistently recognized that "[t]hreats to tribal natural resources, including those that affect tribal cultural and religious interests, constitute threats to tribal self-governance, health and welfare." *FMC Corp. v. Shoshone-Bannock Tribes*, 942 F.3d 916, 935 (9th Cir. 2019). This is especially salient in the context of water, which courts have described as a "unitary resource." *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 52 (9th Cir. 1981). "The

12

actions of one user have an immediate and direct effect on other users." *Id.* Mr. Vipond's proposed individualized lens simply does not fit the nature of water use: each individual, incremental use may not be enough to trigger jurisdiction under *Montana*, but the cumulative effects of water use are an altogether different matter.

Second, without a class-wide lens, it would otherwise be exceedingly rare to meet the standard required under the second *Montana* exception, particularly under the heightened "catastrophic effects" lens endorsed by certain courts.[8] As the Tribal Court observed, if a tribe must establish that an *individual's conduct* would imperil tribal health or welfare before exercising regulatory jurisdiction, tribal regulatory programs would devolve into serial litigation, Memorandum Decision, p. xxxiv, preventing meaningful and effective management of tribal resources and relationships. Further, forcing tribes into piecemeal litigation rather than general regulation (where appropriate) would undercut the federal policy of maintaining tribal sovereignty and self-government. *See Iowa Mut. Ins. Co.*, 480 U.S. at 14-15 (endorsing federal policy towards tribal self-government).

Finally, Mr. Vipond's concern that applying a class-wide lens would swallow the *Montana* rule (that tribes usually lack authority over non-members, particularly on non-Indian land) is unfounded. In fact, the caselaw shows the opposite is true: courts have generally analyzed the second *Montana* exception in a refined, careful manner. For example, while recognizing the importance of hunting and fishing for certain tribes, *Montana* rejected mere importance as a basis for jurisdiction under the second *Montana* exception. *Montana*, 450 U.S. at 564 (noting that regulation of hunting and fishing bore no clear relationship to tribal self-government or internal relations) and 566 (noting that nothing in record suggested that non-Indian hunting and fishing threatened the tribe's political or economic security, subsistence, or welfare, and tribe historically deferred to state regulation); see *also Bourland*, 39 F.3d at 870-71 (concluding that non-Indian hunting and fishing on taken land did not threaten tribal concerns so as to justify tribal regulatory authority, but recognizing that tribe may seek relief in the future if such conduct "escalate[d] in severity"); *Lower Brule*, 104 F.3d at 1024 (similar).

The Tribal Court stated:

> Evaluating the threats posed by a class of activity is the only reasonable approach in determining whether a regulatory scheme meets the second *Montana* exception. The exception enables tribes to protect themselves from serious threats to their political integrity, economic security, or health and welfare. There exist many activities for which the cumulative harms can be devastating even if the impact of each individual instance of conduct may not necessarily be – hunting and fishing, the discharge of water pollutants, and high-capacity water appropriations are all examples.
>
> As courts have observed, a focus on cumulative impacts is indeed imperative when it comes to water resources.

Memorandum Decision, p. xxxiii.

---

[8] We address this purported heightened standard—and whether it accurately reflects the state of the second *Montana* exception—below.

We agree with the Tribal Court and conclude that the class-of-activity lens is the proper scope of inquiry under the second *Montana* exception. Thus, the issue we must decide in this case is whether the class-of-activity at issue here—high capacity ground water wells and high capacity surface water pumping—has a sufficient impact on the Nation to support tribal regulatory and adjudicatory jurisdiction to enact the Ordinance and apply it to Mr. Vipond under the second *Montana* exception.

Is the Standard for Regulatory Jurisdiction Different From the Standard for Adjudicatory Jurisdiction

Before answering that question, we first address several additional issues raised by the parties relating to proper interpretation of the extent of an Indian tribe's jurisdiction over nonmember conduct on fee land. The first is whether regulatory jurisdiction is coextensive with adjudicative jurisdiction.[9] The Tribal Court stated: "If the dispute being adjudicated in any way would impact a non-Indian's use of his privately-owned fee lands, even when a valid regulatory basis may exist, the Court seems to require a heightened showing that the adjudication of the liability of the non-Indian is necessary to avoid 'catastrophic consequences' or a showing that such adjudication necessary in order to avoid the 'imperiling of the subsistence' of the Tribe." Memorandum Decision, p. xxxvii. The parties, however, both state that regulatory and adjudicative jurisdiction are coextensive. WEDNR Opening Br. at p. 16-17; Vipond Opening Br. at p. 19-20.

We disagree with the Tribal Court that there is a heightened standard for adjudicatory jurisdiction. Instead, we conclude that regulatory and adjudicatory jurisdiction are coextensive and the second *Montana* exception analysis applies equally to both.

The *Montana* doctrine sets the outer limits of both regulatory and adjudicatory jurisdiction over nonmembers. *Attorney's Process & Investigation Servs. v. Sac & Fox Tribe*, 609 F. 3d 927, 936 (8th Cir. 2010). A "tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction." *Strate*, 520 U.S. at 453. We have not located a case in which the Supreme Court has decided whether adjudicatory jurisdiction is as extensive as regulatory jurisdiction. *Accord FMC Corp.*, 942 F.3d at 941 (stating that "Supreme Court has never decided whether a Tribe's adjudicatory jurisdiction is necessarily as extensive as its regulatory jurisdiction"). But the Supreme Court has stated that when regulatory authority exists, adjudicatory authority over disputes arising out of such regulated activities presumptively also lies in the tribal court. *Id.* (citing *Strate*, 520 U.S. at 453; *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 18 (1986)). In *FMC*, the court concluded tribal court had adjudicatory jurisdiction "based on [its] holding on the existence of regulatory jurisdiction, the nature of the tribal sovereign interests, long-standing principles of Indian law, and congressional interest in tribal self-government." *Id.* Further, it is nonsensical to conclude that a tribe has authority to enact a regulation but lacks judicial jurisdiction to enforce it.[10]

---

[9] Legislative, or regulatory, jurisdiction "'refers to the power of a state to apply its laws to any given set of facts. Judicial jurisdiction, in contrast, is the power of a state to try a particular action in its courts.'" Laurie Reynolds, *Jurisdiction in Federal Indian Law: Confusion, Contradiction, and Supreme Court Precedent*, 27 N.M.L.R. 359, 368, n.68 (1997).

[10] Instead, a prerequisite to Tribal Court jurisdiction over Mr. Vipond with respect to his pumping activity is the tribe's authority to enact a regulation and apply it to Mr. Vipond in the first place. In this respect, this case is similar to other cases involving the application of tribal regulatory programs to non-Indians. *See, e.g.*, *Confederated Salish & Kootenai Tribes*, 665 F.2d at 964 (addressing tribe's power to regulate, under a "Shoreline Protection Ordinance," usage of riparian rights, including by individual non-Indian party); *Big Horn*

14

We therefore conclude that, if the Nation had regulatory jurisdiction to promulgate the Ordinance, then the Tribal Court likewise has adjudicatory jurisdiction to review disputes concerning application and enforcement of the Ordinance.

<u>Effect of the Court of Appeals' October 24, 2023, Remand Order</u>

We are not persuaded by Mr. Vipond's argument that our October 24, 2023, order remanding this case to the Tribal Court precludes consideration of the Nation's regulatory jurisdiction. Vipond Opening Br. at 7-10; Order, October 24, 2023, Case No. GC2023-00001. The Tribal Court commented on the October 2023 order: "The remand order does not direct this Court to assess whether the [Nation] has the regulatory authority under federal court precedents to enact the Ordinance in question and apply it to all non-Indian water extractors on the White Earth reservation, but only whether the Court has jurisdiction to enjoin this Defendant or to enter declaratory relief against him." Memorandum Decision, p. xxiv.

This Court's October 2023 order instructed the Tribal Court to determine whether it had jurisdiction to determine the WEDNR's action against Mr. Vipond. Nothing in our October 2023 order precluded the Tribal Court from engaging in the full analysis necessary to determine its jurisdiction over this dispute, including whether the Nation had authority to promulgate the Ordinance in the first place. Further, given our analysis above, the regulatory and adjudicative jurisdiction standards are united—thus, the Tribal Court could not engage in one without engaging in the other under the circumstances of this case.

<u>Interpretation of the Second *Montana* Exception Standard</u>

The Tribal Court suggests that the Supreme Court elevated the showing required under the second *Montana* exception in its decision in *Plains Commerce*, Memorandum Decision, p. xxviii, in which the Supreme Court commented that tribal jurisdiction must be "necessary to avert catastrophic circumstances." *Plains Commerce*, 554 U.S. at 341. Similarly, the Eighth Circuit Court of Appeals has relied on the "catastrophic circumstances" standard. *See, e.g.*, *Vipond II*, 166 F.4th at 700-01; *Belcourt Pub. Sch. Dist. v. Herman*, 786 F.3d 653 (8th Cir. 2015); *Fort Yates Pub. Sch. Dist. #4 v. Murphy*, 786 F.3d 662 (8th Cir. 2015). In *Belcourt*, the Eighth Circuit Court described the second *Montana* exception as "necessarily narrow" and applied the heightened standard purportedly set out in *Plains Commerce* to conclude that the "claims and alleged conduct at issue in this case

County, 526 F. Supp. 3d at 762, 763 (addressing tribe's "regulatory authority to apply [tribal regulation] and the adjudicative authority to enforce violations of [tribal regulation]" against non-Indian energy cooperative). In those cases, the courts concluded that the regulations at issue were valid exercises of tribal regulatory jurisdiction under the second *Montana* exception. And in *Big Horn County*, the court explicitly granted the tribal defendants' motion for summary judgment, which argued that the tribe had regulatory and adjudicatory jurisdiction over the energy cooperative. *Big Horn County*, Case No. 1:17-cv-65, ECF Nos. 87 and 88. On appeal, the 9th Circuit stated that the first *Montana* exception was "sufficient to sustain tribal jurisdiction over the dispute." *Big Horn County Elec. Coop., Inc. v. Big Man*, No. 21-35223, 2022 U.S. App. LEXIS 6349, at *2 (9th Cir. Mar. 11, 2022), cert. denied (Dec. 12, 2022). In other words, the tribal court in *Big Horn County* had jurisdiction to adjudicate claims relating to winter shutoffs by the cooperative that were prohibited under the regulation.

clearly do not 'imperil the subsistence' of the Tribe, and Tribal Court jurisdiction is not 'necessary to avert catastrophic consequences.'" *Belcourt*, 786 F.3d at 661.[11]

We acknowledge that some other courts have relied substantively on or cited the "catastrophic consequences" version of that exception. *See Ute Indian Tribe of the Uintah & Ouray Reservation v. McKee*, 32 F.4th 1003, 1010 (10th Cir. 2022); *Window Rock Unified Sch. Dist. v. Reeves*, 861 F.3d 894, 919 (9th Cir. 2017) (dissent), *cert. denied*, 138 S. Ct. 648 (2018); *but see FMC Corp.*, 942 F.3d at 935, 939 (9th Cir. 2019) (explaining second *Montana* exception and citing *Plains Commerce* without using "catastrophic consequences" language, despite affirming district court's conclusion that hazardous waste storage posed potentially catastrophic risk to tribe); *see also The Sovereign Self-Preservation Doctrine in Environmental Law*, 133 Harv. L. Rev. 621, 631 (2019) (citing cases that apply a broader second *Montana* exception than that suggested in *Plains Commerce*).

In our view, the elevated "catastrophic circumstances" standard is inconsistent with *Montana* itself and subsequent caselaw. *Montana* does not contain language requiring the "direct effects" it contemplates under the second exception to be "catastrophic." Instead, the Supreme Court described the standard as involving "conduct that threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe," conduct that "so threaten[s] the Tribe's political or economic security as to justify tribal regulation," and conduct that "imperil[s] the subsistence or welfare of the Tribe." *Montana*, 450 U.S. at 566.

Subsequent caselaw considered whether the Supreme Court's *Brendale* decision heightened the *Montana* standard by requiring a "demonstrably serious" effect that "imperils" the political integrity, economic security, health, or welfare of the tribe. *See, e.g., Bourland*, 39 F.3d 870, n.4 (concluding that Justice White's opinion in *Brendale* expressed an elevated standard for the second *Montana* exception by requiring a "demonstrably serious" impact that "imperils" tribal interests but refusing to decide whether *Brendale* did, in fact, modify the *Montana* standards); *Lower Brule*, 104 F.3d at 1023, n.3 (same). In *Montana v. United States EPA*, the court suggested that *Brendale* did indeed heighten the *Montana* standard, or at least add substantive considerations to its scope: "the potential impact of regulated activities must be serious and substantial." *Montana v. EPA*, 137 F.3d at 1140-41. But *Brendale* decidedly did not raise the *Montana* standard to the level of requiring a showing of "catastrophic consequences."

Later, *Plains Commerce* described the second *Montana* exception as authorizing tribal jurisdiction when "non-Indians' 'conduct' menaces the 'political integrity, the economic security, or the health or welfare of the tribe.'" *Plains Commerce*, 554 U.S. at 341. The nonmember conduct must "more than injure the tribe, it must 'imperil the subsistence' of the tribal community." *Id.* (quoting *Montana*, 450 U.S. at 566). To this point, *Plains Commerce* hewed closely to the *Montana* language. But then *Plains Commerce* cites to "a commentator" as stating that "'the elevated threshold for application of the second *Montana* exception suggests that tribal power must be necessary to avert catastrophic consequences.'" *Id.* (emphasis added) (quoting Cohen's Handbook of Federal Indian Law, § 4.02(3)(c), at 232, n.220 (2005)). The "catastrophic consequences" language appears nowhere in *Montana*. Further, *Plains Commerce* appears to take the Cohen commentary quotation out of context. The Cohen footnote that *Plains Commerce* cites states:

---

[11] The Eighth Circuit's explanation of the second *Montana* exception in *Fort Yates* mirrors its analysis in *Belcourt*. *Compare Fort Yates*, 786 F.3d at 669-70 *with Belcourt*, 786 F.3d at 660-61. Both decisions were published on May 15, 2015.

16

> In a footnote, the [*Atkinson*] Court observed that "unless the drain of the nonmember's conduct upon tribal services and resources is so severe that it actually 'imperil[s]' the political integrity of the Indian tribe, there can be no assertion of civil authority beyond tribal lands." *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 657-658 n.12 (2001) (quoting *Montana v. United States*, 450 U.S. 544, 566 (1981)). This elevated threshold for application of the second *Montana* exception suggests that tribal power must be necessary to avert catastrophic consequences. In *Montana* itself, however, the Court reasoned that the existence of state rather than tribal authority on non-Indian fee lands had had practically no effect on tribal jurisdiction over hunting and fishing on Indian lands, and that the tribe had long accommodated itself to the exercise of state jurisdiction.

Cohen § 4.02(3)(c), at 232, n.220. Thus, in context, the commentary is simply noting that the *Atkinson* footnote appears to be inconsistent with *Montana* itself. Further, only the commentary uses the term "catastrophic," while *Atkinson* uses "imperil," in keeping with *Montana*.[12]

Analysis of the second *Montana* exception was not necessary to the *Plains Commerce* decision for two reasons. First, in *Plains Commerce*, the Court distinguished the *sale* of *land* from the "activities" or "conduct" to which the Court concluded the *Montana* exceptions apply. *Plains Commerce Bank*, 554 U.S. at 332-35 (stating that *Montana* limited its application to "activities" on, "conduct" on, or "uses" of land, but distinguishing the sale of land from nonmember "activities," "conduct," and "use"). Similarly, the Court described several times that tribes could regulate "certain *forms* of *nonmember conduct* on tribal land" or fee land. *Id.* at 333 (emphasis added) (citing examples, including severance taxes on natural resources, sales taxes on nonmember businesses, and licensing requirements for hunting and fishing); *id.* at 335 (certain "*forms* of *nonmember behavior*, even on non-Indian fee land, may sufficiently affect the tribe as to justify tribal oversight" (emphasis added)). In other words, according to the *Plains Commerce* logic, *Montana* does not apply to sale of nonmember fee land in the first place, because sale of nonmember fee land is not nonmember "conduct" contemplated under the *Montana* rule. Second, neither the district court nor Eighth Circuit Court of Appeals decided whether the second *Montana* exception applied to the circumstances at issue in *Plains Commerce*.

Perhaps most importantly, as the United States pointed out, see U.S. Amicus Br. p. 7 (WEDNR Addendum, p. 48), the most recent Supreme Court case interpreting the *Montana* exceptions did not apply an elevated "catastrophic consequences" standard, even while citing to *Plains Commerce*. See *Cooley*, 593 U.S. at 350-51 (describing second *Montana* exception). Instead, in *Cooley*, the Court relied on *Montana*'s language: a "tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or

---

[12] One might contend that use of the term "catastrophic" in both the Cohen commentary and, as a result, in *Plains Commerce* does nothing to expand the Montana standard, which requires conduct that "imperils" the tribe. We acknowledge that judicial opinions are not statutes, such that the verbiage chosen may not hold the same import. But we think it worth noting that the terms "catastrophic" and "imperil" nevertheless convey different levels of seriousness and impact. "Catastrophic" and "imperil" are not equivalent. We conclude that the *Plains Commerce* Court's use of "catastrophic" was inconsistent with the standard set out in *Montana*, and there is no evidence in *Plains Commerce* that that Court sought to heighten the *Montana* standard.

welfare of the tribe." *Id.* at 350 (quoting *Montana*, 450 U.S. at 566). The *Cooley* Court further noted that "'certain forms of nonmember behavior' may 'sufficiently affect the tribe as to justify tribal oversight.'" *Id.* at 354 (quoting *Plains Commerce*, 554 U.S. at 335).

Finally, the purported "catastrophic circumstances" standard would unduly restrict tribal authority. If a tribe must demonstrate that catastrophic circumstances will result before it may assert jurisdiction, tribes will be subjected to conduct resulting in nearly catastrophic consequences with no voice in the matter, little ability to prevent such conduct, and limited recourse. *See The Sovereign Self-Preservation Doctrine*, 133 Harv. L. Rev. at 631 (stating that the "catastrophic consequences" view diminishes tribal sovereignty to the point tribes "can protect nothing more than [their] bare existence. The tribe must absorb every blow but the last one"). The standard would impair tribal sovereignty and hamper tribal authority to regulate natural resources so vital to tribal life.[13]

We conclude that a tribe need not show that a class of nonmember conduct on fee land will present catastrophic consequences for the political integrity, economic security, health, or welfare of a tribe in order to establish jurisdiction under the second *Montana* exception. *Montana*, 450 U.S. at 566. Instead, we agree with the *Montana-Cooley* formulation: the tribe must show that the class of conduct will threaten or directly affect tribal political integrity, economic security, health, and or welfare, or may imperil the subsistence of the tribe. *Id.*

Nevertheless, even if the standard has been elevated such that a tribe must show the potential of catastrophic consequences in order to establish its jurisdiction, we conclude even that heightened standard is met here, as discussed in the following section.

### Whether the Second *Montana* Exception Is Met

We next address whether the Tribal Court's findings of fact with respect to the cumulative impacts of high capacity wells and pumps are supported in the record and, under the second *Montana* exception, support tribal authority to enact and enforce the Ordinance and Tribal Court jurisdiction in this case. As an initial matter, neither party contests the correctness of the Tribal Court's findings of fact relating to the cumulative effects of high-capacity pumps and wells on the White Earth Reservation. Mr. Vipond argues only that those findings should not have been made because they address the wrong scope of inquiry (i.e., class of conduct rather than individual conduct)—not that they are clearly erroneous. Vipond Opening Br. at p. 10-11. As a result, any argument that the Tribal Court substantively erred in its findings of facts regarding the cumulative effects of high-capacity pumps and wells is waived. *Jenkins v. Winter*, 540 F.3d 742, 751 (8th Cir. 2008) ("Claims not raised in an opening brief are deemed waived."); *United States v. Reinholz*, 245 F.3d 765, 780 (8th Cir. 2001).

---

[13] At the hearing on these appeals, Mr. Vipond's counsel argued that the fact that he cannot vote in tribal elections supports limits on tribal authority to regulate his use of resources on the Reservation. *See Duro v. Reina*, 495 U.S. 676 (1990) (the inherent sovereignty of an Indian tribe does not extend to the exercise of criminal jurisdiction over nonmember Indians). But that rationale makes little sense in our mobile society. If Mr. Vipond lived in Fargo, North Dakota, for example, he would have no vote in Minnesota, but no one would contend that the Minnesota DNR could not regulate his use of water from the Wild Rice River. A landowner on a reservation may reasonably expect that the governing tribe has an important interest in regulating vital natural resources on the reservation.

18

Further, we conclude that the Tribal Court correctly concluded that the impacts of high-capacity pumping and wells are sufficient to support jurisdiction under the second *Montana* exception, whether under the *Montana* formulation or any purported heightened standard requiring a showing of catastrophic effects. FOF16-19.

*Montana* itself recognized that Indian tribes retain rights to water necessary to make their reservations livable. *Montana*, 540 U.S. at 566, n.15. Other caselaw concerning rights of Indian tribes recognizes the importance of reserving rights, such as hunting, fishing, and gathering, and resources, such as water, necessary for tribes' survival, particularly when guaranteed under treaties with the federal government. *See, e.g., State v. Clark*, 282 N.W.2d 902, 909 (Minn. 1979) (stating that hunting and fishing are "basic incident" of reservation status and noting that "it would be incongruous to construe the treaty as denying the Indians their very means of existence while purporting to grant them a home"); *Cappaert v. United States*, 426 U.S. 128, 138 (1976) (stating that federal reservation of land, including Indian reservations, encompasses water rights "to the extent needed to accomplish the purpose of the reservation"); *Arizona v. California*, 373 U.S. 546, 599-600 (1963) (describing implication that water necessary to support reservation was reserved as of creation of such reservation). This principle applies even if a treaty did not explicitly guarantee or reserve such resource rights. *See, e.g., Clark*, 282 N.W.2d at 908-09 (noting that treaty did not explicitly reference hunting and fishing).

As the Tribal Court observed, the Treaty with the Chippewa of the Mississippi, 1867, 16 Stat. 719 (March 19, 1867) recognized and implicitly guaranteed the White Earth Nation rights to fishing, hunting, and gathering wild rice on the Reservation for subsistence and commercial gain.[14] Memorandum Decision, p. xxii (citing *Clark*, 282 N.W.2d at 909); FOF 2.4-2.5. In the same way, the 1867 treaty reserved the Nation's right to water necessary to support the purpose of the reservation, that is, to provide a home for the Nation. *See Colville Confederated Tribes v. Walton*, 647 F.2d 42, 47 (9th Cir. 1981) (stating that purpose of Indian reservation is to provide home for the Indians and must be construed liberally); *Arizona*, 373 U.S. at 599-600.

The harvesting of wild rice for both food and income, as well as its availability for migratory waterfowl, is dependent on the quantity and quality of the Nation's water supply. Other activities including fishing are likewise dependent. The Nation's migration history and major ceremonies involve water. FOF 1.1 and 1.2. And the Nation's water supply may be drastically impacted by high capacity wells and pumps within the Reservation. Depletion of the Nation's water would cause severe harms to a large percentage of the Nation's citizens who depend on wild rice, fish, and other

---

[14] We acknowledge that prior treaties explicitly reserved the "right to hunt and fish," Treaty with the Chippewa, 1854, 10 Stat. 1109, art. XI, and tribal "privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers and lakes included in the territory ceded," Treaty with the Chippewa, 1837, 7 Stat. 536, art. V. But in the context of the 1855 Treaty with the Chippewa, which the Chippewa leaders protested as failing to set aside sufficient natural resources for tribal members, we do not find the 1867 treaty's omission of this type of explicit reservation language material. As an initial matter, the Supreme Court explicitly concluded that the 1855 Treaty did not abrogate the rights expressed in the 1837 treaty. *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999). Moreover, we agree with the United States as amicus and the caselaw in recognition that treaties with Indian tribes must be understood as tribes would have understood them, *id.* at 196, construed liberally in favor of tribal interests, *id.* at 200, and to guarantee the resources necessary to supporting a functioning reservation, *see Clark*, 282 N.W.2d at 909; *Arizona*, 373 U.S. at 599-600; *see also* U.S. Amicus Br. p. 3-4 (WEDNR Addendum p. 44-45).

natural resources for their food supplies and income and would hamper the Nation's cultural and spiritual practices.

As they did historically, the Nation's members continue to rely on wild rice and fishing for subsistence, avoiding millions of dollars in food purchases annually. FOF 3.1, 3.3, 3.4, 3.8, 4.11. This is particularly salient in light of the high poverty rate among members. FOF 4.1. Some members also rely on wild rice and bait harvesting for all or much of their income. FOF 4. Collectively, the percentage of the Nation's members engaged in wild rice harvesting and bait fishing as income sources exceeds 15% of the Nation's population; for some members, such activities are a primary income source. FOF 4.3, 4.13, 4.17. The wild rice harvest—including subsistence use and sale—contributes millions of dollars annually to the Nation's economy. FOF 4.12. Likewise, bait fishing contributes millions of dollars annually to the Nation's economy. FOF 4.15, 4.16. Any reduction in harvest reduces the resulting economic benefit to the Nation. FOF 4.19.

Wild rice and baitfish, and the harvest thereof, have not only economic significance but also cultural and spiritual significance to the Nation. See generally FOF 1.1, 3-5. Indeed, the Nation's migration story starts with a "spiritual mandate to find and care for the food that grows on the water," that is, wild rice. FOF 1.1. Wild rice features in the Nation's celebrations and ceremonies. FOF 1.3. Thus, wild rice, like water, is of foundational importance to the identity of the Nation and its members.

Lake sturgeon also feature prominently in the Nation's culture, identity, and history. FOF 1.5, 1.6, 5.1. As a result, the Nation has sought to reintroduce lake sturgeon in reservation waters for about 25 years. FOF 5.3, 5.4, 5.10. The Wild Rice River is among the habitats used and useable by lake sturgeon. FOF 5.6, 5.9.

Adequate stream flow and water levels are critical for wild rice, bait, lake sturgeon, and other species, including fish harvested for subsistence, FOF 6.1, 6.2, and low water levels reduce the Reservation's capacity to sustain subsistence, economic opportunity, and cultural and historical significance derived from wild rice and fishing. FOF 6.3-6.10. Low flow and water levels reduce available habitat for each species, including habitat availability along the Wild Rice River.

The Reservation's waters—including lakes, streams, and groundwater—are hydrologically interconnected. FOF 7.1. As a result, groundwater and surface pumping affect not only the immediate water body from which water is withdrawn, but also can affect a broad hydrological system.[15] FOF 7.2, 7.4, 9.1, 9.3. High-capacity water appropriations using reservation waters are increasing—in fact, they increased tenfold from 1993 to 2021, and continue to increase. FOF 8.1, 8.2. Similarly, high-capacity appropriations located near, but outside the boundaries of, the reservation are increasing and may contribute to reservation water issues given the underlying hydrological connections. FOF 8.3. Appropriations within the Wild Rice River watershed are increasing and may double with recent appropriations permitted by the MNDNR. FOF 8.5-8.7. And the MNDNR has not taken into account lake sturgeon, wild rice, and bait fishing in its permitting decisions.

---

[15] And, as the United States pointed out, "water systems do not follow the 'checkerboard' pattern of Indian and non-Indian fee lands often found on reservations today, including on the Nation's Reservation." U.S. Amicus Br., p. 10-11 (WEDNR Addendum at p. 51-52). Thus, members and nonmembers alike are affected by each other's water use.

Existing and new appropriations on and near the reservation affect the natural flows and levels of water bodies (including groundwater) on the Reservation, particularly when water flow and level is naturally low as in summer months. FOF 9.1, 9.2, 9.3, 11.2. This can contribute to lost habitat for wild rice, bait, and other fish. FOF 9.5, 9.6, 9.7. In other words, left unchecked, high capacity water appropriations could result in the reduction or even elimination of the wild rice harvest, bait fishing, subsistence fishing, and the benefits—economic, cultural, and spiritual—those activities entail.

Exploitation of reservation waters, taking into account existing high-capacity wells and pumps and new high-capacity wells and pumps, poses significant threats to the Nation's guaranteed treaty rights to water, fishing, and wild rice as well as to important aspects of the Nation's cultural and spiritual traditions—the water appropriations both current and future directly affect water levels, which in turn directly affect important economic drivers and shared cultural and spiritual identity of the Nation. Moreover, such effects could be catastrophic, to the point of eliminating the wild rice harvest, bait fishing opportunities, and sturgeon regeneration. As the Nation's mandate to migrate to what is now Minnesota and the Reservation has long demonstrated: the Nation has been tied to wild rice, the "food that grows on the water," and water for thousands of years. FOF 1.1. Indeed, for this and the foregoing reasons, we cannot conceive of a resource more vital to the Nation—for its subsistence, economic prosperity, and culture—than its water. And substantial diminution and degradation of the Nation's waters imperils its ways of life.

In sum, we conclude that the Nation had authority under the second *Montana* exception to enact the Ordinance and apply it to Mr. Vipond's on-reservation proposed pumping activities. We note that the Ordinance does not restrict Mr. Vipond's use or sale of his land—rather, it regulates certain *conduct*, namely, his proposed installation of a high-capacity pump and withdrawal of large quantities of water from the Wild Rice River. Water withdrawals through high capacity water wells and pumps, into which category Mr. Vipond's proposed activities fall, have a direct effect on and may imperil the Nation's economic security, health, and welfare, and result in catastrophic consequences for the Nation and its citizens. For the same reasons, we further conclude that the Tribal Court had subject matter jurisdiction over this declaratory judgment action.

### WE NEED NOT ADDRESS THE TRIBAL COURT'S FACTUAL FINDINGS REGARDING THE EFFECTS OF MR. VIPOND'S PROPOSED PUMPING ACTIVITY OR THE NAVIGABILITY OF THE WILD RICE RIVER

We note that the Tribal Court made numerous findings of fact concerning the nature and effect of Mr. Vipond's proposed pumping activities, presumably because the Tribal Court concluded that the jurisdictional analysis under *Montana* required consideration of the effects of Mr. Vipond's conduct as an individual in addition to the effects of the collective conduct of water appropriators across the Reservation. Because we conclude that the proper scope of inquiry is the class of conduct, rather than individual conduct, we conclude that review of the Tribal Court's findings of fact concerning Mr. Vipond's particular proposed pumping activities is not necessary or germane to our decision that the Nation possesses regulatory jurisdiction and that the Tribal Court possesses adjudicative jurisdiction in this case. As such, we need not address the Tribal Court's factual findings pertaining to Mr. Vipond's particular pumping activities here. See *Walker v. St. Antony's Medical Ctr.*, 881 F.2d 554, 557 (8th Cir. 1989) (declining to review alternative arguments not necessary to court's decision); *Highland Supply Corp. v. Reynolds Metals Co.*, 327 F.2d 725, 729 (8th Cir. 1964) ("It is a uniform course of appellate review procedure to decline to review questions

21

not necessary to a decision by an appellate court."). And we need not decide whether Mr. Vipond's proposed pumping activities individually would justify a different case under a different theory not before us. Similarly, the Tribal Court's findings of fact regarding navigable waters are not necessary or germane to the instant decision, and we need not address them.

WEDNR asserts that vacating the Tribal Court's findings is necessary to "avoid confusion in future proceedings as to the issues resolved in this case." WEDNR Opening Br., p. 30. This contention appears to arise out of apprehension of the application of collateral estoppel, which applies when an issue was (1) actually litigated by the parties, (2) fully, completely, and necessarily determined by the court, and (3) essential to the judgment. *Montana v. United States*, 440 U.S. 147, 153, (1979) (stating that collateral estoppel involves an issue that is "actually and necessarily determined by a court of competent jurisdiction" such that the court's determination "is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation"); *In re Miera*, 926 F.2d 741, 743 (8th Cir. 1991) (describing the four elements of collateral estoppel, including that the issue must be the same as that litigated in a prior action, actually litigated, determined by a "valid and final judgment," and essential to the judgment). But our jurisdictional decision today does not involve, let alone necessarily resolve, either the navigability of the Wild Rice River or the precise effects of Mr. Vipond's proposed pumping activity alone.

### THE STATE OF MINNESOTA IS NOT A NECESSARY PARTY

In Mr. Vipond's Special Appearance Answer to the WEDNR's Amended Complaint, Mr. Vipond alleged:

> 39.    The Minnesota DNR is a necessary and indispensable party to the litigation in this matter, and unless joined in the litigation, dismissal of the action is required. The Amended Complaint fails to join a necessary and indispensable party whose participation in this action is mandated because it affects the rights of the State of Minnesota as the owner of the bed of the Wild Rice River, a navigable body of water and because the State of Minnesota has the jurisdiction and authority to issue the permit for the pumping activities of the Defendant that are the subject matter of the Amended Complaint.

> 40.    Plaintiff has failed to join a party pursuant to [White Earth Rule of Civil Procedure IX].

Special Appearance Answer to Amended Complaint, October 17, 2023, p. 6. The parties briefed the joinder issue in the Tribal Court. The Tribal Court rejected the notion that Minnesota DNR was a necessary party:

> The Court rejects the insinuation at hearing that perhaps the Minnesota DNR is a necessary party to this litigation because the upshot of the [WEDNR] attempting to regulate the Defendant is an evisceration of the Defendant's rights under his Minnesota DNR permit. There are numerous examples of situations where the Courts have recognized dual jurisdiction to regulate in these situations and never found that the State was a necessary party to litigation involving tribal interests or the Tribe was a necessary party to cases involving state interests. See Cotton Petroleum v. New Mexico, 490 U.S. 163 (1989). Nor is the fact that the [WEDNR] did not object to the issuance of a [MNDNR] permit to the Defendant waive its right to argue that the [Nation's] Ordinance applies to him.

22

Memorandum Decision, p. xi, n.6.

In his Notice of Appeal, Mr. Vipond asserted that the Tribal Court erred "by failing to require joinder of the State of Minnesota." Defendant's Notice of Appeal, p. 1. In explaining the legal grounds for the appeal, Mr. Vipond stated:

> The tribal court erred in failing to find that the State of Minnesota is a necessary party to be joined the litigation, as the State is the regulatory agency that issued the permit to Defendant; the State determined that Defendant's water appropriation would not cause harm; the State has jurisdiction over the waters of the Wild Rice River and within the White Earth Reservation; and because the State's rights and sovereignty were being determined in its absence by failing to join the State in the tribal court action.

*Id.*, p. 3.

In his appeal briefs, Mr. Vipond acknowledges that "White Earth has a rule regarding joinder (§ 9.04) and does not expressly employ Fed. R. Civ. P. 19." Vipond Opening Br., p. 12, n.4. Mr. Vipond, however, invokes Federal Rule 19, and concludes that "the principles of equity behind the rule are what Mr. Vipond urged the court to consider." *Id.* Rule 19 in relevant part provides:

> Rule 19. Required Joinder of Parties
>
> (a) PERSONS REQUIRED TO BE JOINED IF FEASIBLE. (1) Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Part (b) of the rule provides: "If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."

Mr. Vipond argues under Federal Rule 19(a)(1)(A) that:
- In Minnesota DNR's absence, the court could not "accord complete relief among existing parties," because this action would determine "which government holds the appropriate regulatory authority [over navigable waters] and over which citizens that authority extends. Excluding one of the sovereigns who has an interest in the water from a determination about water interests results in only partial relief to both Mr. Vipond and WEDNR." Vipond Opening Brief, pp. 15-16.
- Minnesota DNR "claims an interest relating to the subject of the action" and "that disposing of the action in the [DNR's] absence may . . . impair or impede [MNDNR's] ability to protect the interest," because the litigation may "impair[] the State's sovereign interests in its waters and natural resources." *Id.*, pp. 16-17.

23

- The Tribal Court litigation may "leave an existing party subject to a substantial risk of incurring . . . inconsistent obligations because of the [DNR's] interest," because the litigation may "impair[] the State's ability to manage its public waters according to its own regulatory scheme," *id.*, p. 18, "subject State-permittees to potentially inconsistent obligations," *id.*, and "the tribal court made determinations about water availability and the impact of existing appropriations on natural resources that properly belong to the State's comprehensive regulatory framework for public waters," *id.*

WEDNR argues that White Earth Rule of Civil Procedure § 9.04, rather than Federal Rule 19, applies to joinder. WEDNR also contends that the State of Minnesota is not an interested party because WEDNR does not assert a claim against the State "[n]or does WEDNR ask the Court to determine any rights of the State," WEDNR Response Brief, p. 11, that the State does not have exclusive jurisdiction over water rights, that it is possible to "reach a just result" even if the State is not a party, and that the State is not a necessary party to a case that determines a tribe's regulatory authority.

We agree that it is not necessary to look to Federal Rule 19 to determine if the State is a necessary party justifying dismissal if the party is not joined in the lawsuit. Chapter VII, Section 6(c) of the White Earth Band Judicial Code authorizes a White Earth Court to "apply statutes, regulations and case law of any tribe or the federal government or of any state" "[i]n the event that an issue arises in an action which is not addressed by all customs and traditions of the Band, this Code, all amendments thereto, or all tribal laws." In this instance, the Court need not apply another sovereign's laws regarding joinder because White Earth already has a code that addresses the legal issue. Thus, we look to White Earth Rule of Civil Procedure § 9.04 to decide Mr. Vipond's appeal of the joinder issue.

That rule, entitled Joinder of Parties, provides:

1. To the extent possible, all persons or parties interested in a particular action shall be joined in the action.

2. The failure to join a party over whom the Court has no jurisdiction will not require dismissal of the action unless it would be impossible to reach a just result without such party.

3. Where joinder of an interested person is not possible, the Court shall attempt to fashion a resolution so as to do the greatest justice possible under the circumstances.

It is important to remember what this case is about. The Nation requests a declaration that Mr. Vipond may not pump certain volumes of water from the Wild Rice River without obtaining a permit from WEDNR in accordance with the Ordinance (and an injunction to enforce the requirement that Mr. Vipond apply for a WEDNR permit). See Second Amended Complaint, March 28, 2024, ¶1. This case is not about whether Mr. Vipond is entitled to a permit or to pump any specified volume of water under the Ordinance. Because we find earlier in this opinion that the Nation has authority to regulate high-capacity water appropriations of members and nonmembers, those issues would be reserved to WEDNR if Mr. Vipond applies for a permit and subject to potential judicial review.

24

This case also is not about allocating water rights among parties with a right to the water in which all parties may need to appear to protect their interests. See, e.g., Hood ex rel Mississippi v. City of Memphis, 570 F.3d 625 (5th Cir. 2009) (Tennessee is a necessary party to determine equitable apportionment of water in aquifer between states) (cited by Mr. Vipond).

The evidence admitted to the Tribal Court showed that the State of Minnesota knew of the White Earth permitting requirement and Tribal Court litigation and acknowledged White Earth's authority to regulate water usage on the Reservation. According to the Court's findings—which Mr. Vipond does not contest—MNDNR and the Minnesota Department of Agriculture "informed Defendant of his need to obtain any other permits that may apply, including any permits required by the White Earth Nation." FOF 14.5, 14.6. The record shows that two MNDNR personnel, a fisheries specialist and a hydrologist, testified in the Tribal Court, and a letter from the MNDNR hydrologist concerning Mr. Vipond's MNDNR permit notified Mr. Vipond of the existence of the Ordinance "which may apply to" Mr. Vipond's activities.

Mr. Vipond suggests that White Earth's water permitting requirement impairs the State of Minnesota's sovereignty or its authority over waters and therefore the State must be a party to this case. But White Earth's water regulation system does not threaten the State's permitting system or challenge the State's right to issue a permit to Mr. Vipond. The State does not have an interest in promoting Mr. Vipond's taking of water from the Wild Rice River. The State may set limits on such usage according to its policies and interests. White Earth may impose more stringent requirements or even deny water usage depending on Tribal policies and interests, but such regulation does not infringe upon the State's authority. This is not a case of State supremacy in regulation of water use. Jurisdictions may have overlapping interests and regulations over resources.

The State of Minnesota may defer to White Earth to grant water usage rights on the Reservation because the "State of Minnesota does not share the same values as the White Earth Nation with respect to water use and the protection of fishing, hunting, and gathering resources, including protection from agricultural irrigation." FOF 15.1. And, in granting Mr. Vipond's permit, "MNDNR did not consider any information regarding potential impacts on minnows, sturgeon, wild rice, or other fisheries or aquatic plants, and the permit contains no terms of conditions designed to protect these Tribal resources." FOF 15.2; see also FOF 13.10 (MNDNR did not assess impacts of wells or pumps on Wild Rice River tributaries), 15.2 (MNDNR did not consider impacts on Tribe's minnow trapping).

Mr. Vipond also argues that he may be subject to inconsistent obligations if the State is not a party to this lawsuit. But this lawsuit is about whether White Earth may require Mr. Vipond to obtain a permit if he intends to pump water from the Wild Rice River. Whatever decision White Earth made on a permit application by Mr. Vipond, such action would not require Mr. Vipond to violate a state order. Contrast Bomer-Blanks Lumber Co. v. Oryx Energy Corp., 837 F. Supp. 769 (M. D. La. 1993) (Louisiana Conservation Commissioner is indispensable party in lawsuit that challenged Commissioner's order to perform nitrogen injection procedures) (cited by Mr. Vipond).

Finally, if the State of Minnesota was concerned that this litigation may infringe on its authority or interests, it could request to intervene in these proceedings. White Earth Rules of Civil Procedure §10.01(1) provides:

25

Upon motion the Court may permit anyone to intervene in an action when the movant claims an interest relating to the property or transaction which is the subject of the action and the movant is so situated that the disposition of the action may as a practical matter impair or impede the movant's ability to protect that interest, unless the movant's interest is adequately represented by existing parties.

Even though the State knows of this proceeding, there is no suggestion that the State has attempted to intervene.

Under White Earth Rule of Civil Procedure § 9.04, we conclude that the State of Minnesota is not an "interested" party such that it need be joined in this action. Moreover, Rule 9.04 does not require dismissal "unless it would be impossible to reach a just result without [the absent] party." We believe that the "result" of this opinion—sustaining the Nation's authority to regulate large scale water usage on the Reservation to protect vital Tribal interests and autonomy—is just.

## THE TRIBAL COURT CORRECTLY DENIED MR. VIPOND'S MOTION FOR SUMMARY JUDGMENT REGARDING THE ORDINANCE

Mr. Vipond also contends that the Nation's Water Protection Ordinance is invalid because it was not approved by the U.S. Secretary of the Interior. Mr. Vipond moved for summary judgment to dismiss the Nation's action on this ground. The Tribal Court denied the motion. Memorandum Decision and Order Denying Defendant's Motion for Summary Judgment, October 14, 2025 ("Summary Judgment Memorandum Decision"). Mr. Vipond appeals the Court's order.

Mr. Vipond argues that the Ordinance is invalid absent the Secretary's approval based on the Minnesota Chippewa Tribe's Constitution, Article VI, Section 1(d):

> The Reservation Business Committee may by ordinance, subject to the review of the Secretary of the Interior, levy licenses or fees on non-members or non-tribal organizations doing business solely within their respective Reservations.

Mr. Vipond contends that the Ordinance levies a fee, so the Secretary's approval is needed.

The Tribal Court concluded that "the Ordinance in question is not specifically for the purpose of levying fines or licenses on non-members but instead is designed to regulate a type of conduct which non-members may engage in on the White Earth [R]eservation." Summary Judgment Memorandum Decision, p. 4.

We agree that the MCT Constitution does not require the Secretary's approval of the Ordinance. The Ordinance does impose a $150 administrative fee on permit applicants—members and nonmembers alike—which the Nation's RBC deemed "appropriate for reviewing and processing permit applications and renewal applications." White Earth Reservation Business Committee, Resolution No. 057-25-030, May 30, 2025. The fee is not imposed for the purpose of doing business on the Reservation but is a charge to defray the expense of processing a permit application, as part of a robust system to protect and manage the Nation's precious water resources.

The Ordinance was passed pursuant to the MCT Constitution's grant of authority to Reservation Business Committees to "manage, lease, permit or otherwise deal with tribal lands, interests in

26

lands or other tribal assets." MCT Constitution, Article VI, Section 1(c). The Ordinance is contemplated by The Minnesota Chippewa Tribe Land Ordinance No. 3 that states: "Each Band government shall retain the inherent authority to protect and manage the use of lands, waters and resources with respect to its Reservation so as to secure the political and economic security of the Band, and the health and welfare of its members." *Id.*, Section 102 (October 22, 1997).

While not dispositive, the MCT's position on the Ordinance is instructive: "[T]he White Earth Band was well within its authority under the MCT Constitution and MCT Land Ordinance No. 3 when it enacted and subsequently amended the White Earth Reservation Groundwater and Surface Water Protection Ordinance." MCT Tribal Executive Committee Resolution No. 21-25, October 24, 2024.

Mr. Vipond contends that letters sent by the U.S. Department of the Interior Solicitor in 1982 show that the MCT Constitution requires Secretarial approval of the Nation's Ordinance. These letters reference a permit requirement in MCT Natural Resources Protection Ordinance No. 8 (1980). The Solicitor stated: "The tribe has not submitted the ordinance for review by the Secretary of the Interior. Since it applies to non-Indians and calls for permits it is our view that the ordinance requires Secretarial review under the tribe's constitution." Letter from United States Dept. of Interior to Mahnomen County Recorder, April 19, 1982; Letter from United States Dept. of Interior to Becker County Recorder, Nov. 5, 1982. The letters do not cite the MCT Constitution's provision that purportedly required secretarial approval.

In our view, the MCT Constitution, Article VI, Section 1(d) does not govern applications for permits such as those required by the Ordinance but addresses a Band's authority to "levy" a "license" or "fee" on nonmembers. Determining the meaning of the constitutional provision requires an interpretation of its words and purpose. The meaning of the Minnesota Chippewa Tribe Constitution is best determined by the Minnesota Chippewa Tribe and its Bands' tribal courts, rather than by a federal government appointee more than 40 years ago. *Accord Runs After v. United States*, 766 F.2d 347, 352 (8th Cir. 1985) (stating that interpretation of tribal constitution and tribal law is not within federal district court jurisdiction).

Mr. Vipond also cites *Kerr-McGee Corp. v. Navajo Tribe of Indians*, 471 U.S. 195, 199 (1985), for the proposition that "when tribal constitutions impose limits on tribal authority, those limits remain enforceable unless formally amended." Vipond Opening Br. at 25. That may be true, but in this case, we find that the MCT Constitution does not impose the limit of Secretarial approval on the Nation's authority to pass and enforce the Ordinance.

Finally, we note that we have sustained the Nation's authority to regulate water use by members and nonmembers to preserve the economic security, health, and welfare of the tribe. *See Montana*, 450 U.S. at 511. This authority stems from the Nation's inherent sovereignty to exercise some jurisdiction over non-Indians and to preserve certain sovereign interests. *See API*, 609 F.3d at 935-36 (*citing Montana*, 450 U.S. at 565 *and Plains Commerce*, 128 S. Ct. at 2723). A tribe's exercise of its inherent authority, within the parameters of the *Montana* doctrine, requires no approval by any agency of the federal government.

The Tribal Court's denial of Mr. Vipond's motion for summary judgment is affirmed.

27

**CONCLUSION**

We hold here that the Nation had regulatory jurisdiction to enact the Ordinance and the Tribal Court had adjudicative jurisdiction over Mr. Vipond to determine the WEDNR's declaratory judgment claim against him. In other words, Mr. Vipond is subject to the Tribal Court's jurisdiction in determining whether his proposed pumping activity is subject to a validly enacted tribal Ordinance. We therefore affirm the Tribal Court's conclusion that the Nation had regulatory jurisdiction, reverse the Tribal Court's conclusion that it lacked adjudicative jurisdiction over Mr. Vipond, and remand to the Tribal Court to determine whether any form of injunction should issue temporarily or permanently (until such a time as Mr. Vipond applies for and receives a WEDNR permit or exemption). In doing so, we note that it is the WEDNR's prerogative as the regulating agency to determine whether Mr. Vipond should receive a permit or exemption under the Ordinance in the first instance.

We further conclude that we need not address the Tribal Court's findings of fact pertaining to the individualized effects of Mr. Vipond's proposed pumping activity or the navigability of the Wild Rice River. And we conclude that the MNDNR was not a necessary party and the Tribal Court correctly denied Mr. Vipond's motion for summary judgment regarding Secretarial review of the Ordinance.

Dated: July 27, 2026.                              BY THE COURT:

George W. Soule

Lenor Scheffler Blaeser

David Harrington

28